NORFOLK AND WESTERN RAILWAY
COMPANY, Plaintiff,

v.

Robert BURNS, Chief of General Industry Safety Division, Bureau of Safety and Regulation, Michigan Department of Labor; and S. Martin Taylor, Director, Michigan Department of Labor, Defendants.

Civ. A. No. 82–74775.

United States District Court,
E.D. Michigan, S.D.

March 2, 1984.

---

Carson C. Grunewald, Bodman, Longley & Dahling, Detroit, Mich., for plaintiff.

Gregory T. Taylor, Asst. Atty. Gen., Lansing, Mich., for defendants.

BENCH OPINION

RALPH B. GUY, Jr., District Judge.

The court has now concluded a bench trial in this matter and will issue, at this time, an oral opinion which will, of necessity, be in narrative form, the findings of fact and conclusions of law contained therein being the findings of fact and conclusions of law required to be found in a bench trial by the applicable rule of federal procedure.*

---

* This court would not normally publish any oral bench opinions since they have obvious shortcomings as to style, organization, grammar, and syntax. However, both the plaintiff and the defendants requested that this opinion be published, as it involved an area of law in which conflicts were growing and guidance was needed.

This is litigation instituted by the Norfolk and Western Railway Company against certain agents of the State of Michigan, specifically, Robert Burns, the Chief of General Industry Safety Division, and William Long, the Director of the Michigan Department of Labor. Subsequent to the initiation of this litigation, certain changes in personnel listed as defendants were made to reflect changes in those positions, but none of those changes are relevant to the disposition of this matter.

This is essentially litigation brought by the railroad to challenge the right of the State of Michigan, acting through its Department of Labor, to enforce the statute commonly referred to as the Michigan Occupational Safety and Health Act (MIOSHA) found at M.S.A. 17.50(1), *et seq.* [M.C.L.A. § 408.1001 et seq.]. It is the plaintiff's contention that the State of Michigan may not enforce its MIOSHA regulations against the plaintiff because of a federal statutory scheme which has preempted the field; thus, among other things, making it a violation of the supremacy clause for the State to attempt to enforce its state regulations in the face of controlling federal regulations. The court will first reference the facts which led to the institution of this litigation.

The plaintiff is an interstate rail carrier which maintains facilities in the Detroit area in connection with its railroad activities. The plaintiff is not a passenger carrier but carries only freight. The specific area in question is located in Melvindale, Michigan, and constitutes what is commonly referred to as the Oakwood Yard of the plaintiff railroad. Sometime in the month of May, the Michigan Department of Labor, through its Bureau of Safety and Regulation, received a complaint from a railroad employee to the effect that he had been injured by what he construed to be a dangerous condition on the premises of his employer, the plaintiff railroad.

Following the receipt of that complaint, a State of Michigan inspector, Robert Cruzet, was detailed to investigate. On May 28, 1982, Inspector Cruzet presented himself at the Oakwood Yard of the plaintiff railroad, explained his reason for being there, and sought to make an inspection of the premises. This request to inspect was denied. The railroad officials with whom Inspector Cruzet dealt indicated to him that this was done on the advice of legal counsel who were consulted on the spot on May 28. In the face of the refusal, Inspector Cruzet went back, consulted with his superiors, and the decision was made to obtain an administrative warrant. An administrative warrant was sought and issued and is a part of this record, being an exhibit to the deposition of Robert Cruzet (Exhibit 15).

On June 11, 1982, Inspector Cruzet, armed with his warrant and in the company of a Melvindale police officer in the event that there were problems in serving the warrant, returned to the railroad premises, presented the warrant and, after some consultation by railroad officials with their superiors, it was agreed that an inspection should be commenced pursuant to the warrant.

Involved in the inspection were Inspector Cruzet, representatives of railroad management, and an employee representative who was called to the scene at the request of Inspector Cruzet pursuant to a requirement of the MIOSHA statute which requires that there be an employee representative when complaint investigations of this nature are being conducted.

The investigation took approximately two hours. The investigation on Friday, June 11, 1982, concluded sometime around four o'clock in the afternoon, and Inspector Cruzet indicated he had not completed his inspection since the Oakwood facility is large. He indicated he would return on Monday morning to complete his inspection.

He did return on Monday, June 14, 1982, and conducted another two-hour inspection accompanied by essentially the same cast of characters who had accompanied him on June 11, except for the fact that a different employee representative was present at the June 14 inspection.

The result of this two-day inspection was the issuance of a citation directed against the railroad and issued on July 6, 1982. That citation is Exhibit 1 in this trial record. It is also found in the exhibits to the Cruzet deposition that are a part of Exhibit 15. The citation listed four violations and is on a standard Michigan Department of Labor, Bureau of Safety and Regulation, form. The general form of the citation is such that it gives a description of the alleged violation; cites the standard rule, order, or section of MIOSHA that is allegedly violated; sets an abatement date if that is appropriate; and indicates a monetary penalty if that is appropriate.

The four items that were referenced in the citation which was issued to the railroad in this case are as follows:

1. Post the Michigan Occupational Safety and Health Act (MIOSHA) Notice (Poster) in each establishment in a central and conspicuous location with respect to all affected employees to inform employees of the protections and obligations provided for in MIOSHA.

2. Insure that materials, including scrap and debris, are piled, stacked, or placed in a container so as not to create a hazard. (24 ties laying around yard between Tracks 7 and 8 and 9 westbound.)

3. Maintain floor free of slip and trip hazards. (Large rocks, broken ties and air hose stuck in ground in yard work and walk area.)

4. Guard floor hole. (Holes in yard where railroad ties had been replaced and area around ties not filled in.)

As to each of those four items, an abatement date of July 26, 1982, was given. Only one item carried a monetary penalty, and that was Item 1, the failure to post the MIOSHA poster, which item was assessed a penalty of $50.00. It should be noted that in connection with Item 1 of the citation, the fine assessed was paid under protest by the railroad. Furthermore, it should also be noted that in Exhibit 7 of this trial record, a memo prepared by plaintiff's employee Smith relates that he told the inspector that they had had a MIOSHA notice posted, that someone had torn it down, and that he would see that it was put back up.

Insofar as this record is concerned, there is no indication that any other action was taken by the railroad insofar as addressing themselves to the violations noted in the citation.

On August 13, 1982, the Michigan Department of Labor informed the railroad by letter of its failure to file a notification of abatement as required. Shortly thereafter, on August 20, 1982, the railroad instituted an action in federal court predicated on federal question jurisdiction. On November 21, 1982, that case was voluntarily dismissed as a result of discussions at a status conference between the court, the plaintiff, and the defendant in which the court expressed serious doubt as to whether there was federal question jurisdiction predicated on the preemption argument relied on by the plaintiff in light of *Smart v. First Federal Savings & Loan Ass'n of Detroit,* 500 F.Supp. 1147 (E.D.Mich.1980), which was subsequently upheld by the Sixth Circuit Court of Appeals.

Although voluntarily dismissing, shortly thereafter, on December 21, 1982, the plaintiff instituted this present action claiming jurisdiction on more than one ground but specifically alleging diversity jurisdiction. The court would note that, although there still may be some question as to the other jurisdictional basis alleged in this complaint, there is in fact the requisite diversity of citizenship between the parties to appropriately vest this court with diversity jurisdiction. This litigation culminated in the bench trial which concluded today. There is no real disagreement between the parties as to the facts leading to this litigation. There is, as might be expected, however, considerable disagreement as to the legal conclusions that flow from this fact situation.

It is plaintiff's broad primary contention that a federal regulatory scheme—specifically the one evidenced in the Federal Railway Safety Act of 1970, 45 U.S.C. § 421, *et seq.* and the regulations that have been

promulgated thereunder—have in effect preempted any state action insofar as a state's ability to enforce a statute such as MIOSHA against the railroad.

Thus, it would seem apparent that the appropriate starting point in this litigation must be the Act itself, which Act states in § 434 as follows:

The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order or standard, and when not creating an undue burden on interstate commerce.

Although this is a relatively brief passage from the Act, it is extremely significant to this litigation and, accordingly, the court finds it helpful to parse its content.

First, there can be little doubt that the quoted section does express a congressional intent that the standard relating to railroad safety be uniform nationally to the extent that is practicable. To the degree that this pronouncement suggests federal preemption, it is equally important to note that the matter of permissible state regulation is specifically addressed. First, it is clear that there can be no preemption until the Secretary has actually adopted a railroad safety standard. That does not necessarily mean that the standard adopted must detail every conceivable item that might be contemplated thereby; but, at least, there has to be some action generally indicating that the Secretary is acting pursuant to the powers vested in him by Congress.

Second, it is clear from the literal language of the section just quoted that even where the Secretary has acted, a state may still act and may even impose more stringent requirements so long as (1) the requirements relate to an essentially local safety hazard, (2) such regulation is not incompatible with any federal regulation, and (3) such regulation does not create an undue burden on interstate commerce.

Having thus stated the guidelines that are given by the statute itself, it is necessary to apply these guidelines to the facts in this case. The first inquiry is: Have there been any regulations promulgated at the federal level pursuant to the authority delegated by Congress? The answer to that question is yes. Such regulations as have been promulgated are found in this trial record as Exhibit 8, which is a reiteration of the regulations that have been promulgated and published in 49 C.F.R. § 213, et seq. Now, these regulations—referring specifically to the copy of the regulations contained in Exhibit 8—are divided into Subparts A through F, and it is necessary for the court to visit briefly each of those subparts.

Subpart A is entitled "General," and there has been no suggestion in this record that anything contained therein is particularly helpful in the resolution of this dispute.

Subpart B is entitled "Roadbed," and is deemed by the plaintiff to be relevant to these proceedings. Subpart B is relatively brief and, in section 213.31, entitled "Scope," it provides that "[t]his subpart prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed." In subsequent parts of Subpart B the only two specific areas of concern that are addressed are drainage and vegetation.

Subpart C, found in § 213.51, et seq., deals with track geometry. Again, it is helpful to look to what this section says is its scope. The scope is defined in the following language: "This subpart prescribes requirements for the gage, alignment, and

surface of track, and the elevation of outer rails and space limitations for curved track." Although this section is not deemed by the court to be specifically relevant to these proceedings, it is deemed to have some general significance and the plaintiff, of course, contends that it has relevance to these proceedings.

Subpart D deals with track structure and covers in some detail the requirements for ballast, cross ties, track assembly fittings, the physical condition of rails, switches, and devices known as frogs. This section is deemed by the court and urged by the plaintiff to be relevant to these proceedings.

Subpart E is very short. It deals with track appliances and track-related devices, and is not deemed by the court to be specifically relevant, and the record does not reflect any specific argument made by the plaintiff that relates to this Subpart E.

Subpart F deals with track inspections to detect deviations from the standards that are provided in the regulations. Although entitled "Inspections," it does not deal with general safety inspections of the kind that are implicated here.

This then constitutes what the Secretary has done by way of specific regulations, those regulations given the force of law by being adopted and published in the Code of Federal Regulations.

There is one other document that emanates from the Secretary that is deemed relevant, however, and that is found in Volume 43, No. 50 of the Federal Register, Tuesday, March 14, 1978, under a section entitled "Proposed Rules." It deals with what amounts to a policy statement that impacts upon the issues that are before this court for determination.

The section in the Federal Register in fact deals specifically with the interaction of Occupational Safety and Health Administration (OSHA)—which is the federal counterpart of the Michigan Department of Labor under MIOSHA—and the Federal Railroad Administration (FRA). Since the interpretation placed upon statutes and regulations by the agency charged with their enforcement is a legitimate aid to statutory construction, this statement is helpful even though it is not binding upon this court insofar as the question presented is concerned.

Returning to the Federal Register at page 10587, section C is entitled "OSHA Jurisdiction," and is quoted at length because of the relevance of this section to the proceedings before the court:

As noted above, FRA has determined that a territorial approach to the exercise of its statutory jurisdiction over railroad safety such as that proposed in the NPRM would deplete energies and resources better devoted to the safety of railroad operations. If FRA were to address all occupational safety and health issues which arise in the railroad yards, shops, and associated offices, the agency would be forced to develop a staff and field capability which, to an extent, would duplicate the capability already possessed by OSHA. In view of this situation, FRA recognizes that OSHA currently is not precluded from exercising jurisdiction with respect to conditions not rooted in railroad operations nor so closely related to railroad operations as to require regulation by FRA in the interest of controlling predominant operational hazards.

The following survey of OSHA standards is intended to aid the railroad industry in evaluating the breadth of FRA's exercised jurisdiction by contrasting the roles of FRA and OSHA. This discussion cannot be regarded as definitive, since considerable experience in adjusting the relationship of FRA and OSHA standards will likely be required before an optimum Federal regulatory program can be achieved. All statements concerning OSHA and FRA authority and the applicability of individual regulations should be regarded as statements of general principle.

Again, in reading this discussion it should be kept in mind that to the extent matters addressed by the OSHA regulations are connected with or relate to rail-

road operations and may interact or create operational hazards, it may be necessary for FRA and OSHA to consult concerning the interpretation or modification of such standards. As the primary regulatory agency concerned with railroad safety, FRA will not hesitate to adopt its own standards to assure a safe environment for railroad operations and to promote regulatory consistency.

The general policy statement then goes on to specifically delineate certain areas of concern and expresses the opinion of the Secretary relative to these matters. And I will again quote those that are relevant to the proceedings for the court.

The first is entitled "Walking-Working Surface (Subpart D)," and the court presumes that the "Subpart D" references Subpart D of the Code of Federal Regulations provisions dealing with track structure. Under this general title, the following language is again quoted from the Federal Register:

OSHA regulations concerning working surfaces deal with such matters as ladders, stairways, platforms, scaffolds and floor openings. Generally, these regulations are applicable in railroad offices, shops, and other fixed work places. There are three principal exceptions to the rule. First, they would not apply with respect to the design of locomotives and other rolling equipment used on a railroad, since working conditions related to such surfaces are regulated by FRA as major aspects of railroad operations.

Second, as the agency which has exercised jurisdiction over railroad operations, FRA is responsible for the safe movement of rolling stock through railroad repair shops. OSHA requirements for general industry are in some respects inconsistent with the optimum safety of employees in this unique environment where hazards from moving equipment predominate. Therefore, OSHA regulations on guarding open pits, ditches, etc., would not apply to inspection pits in locomotive or car repair facilities. FRA is better equipped to assess proper clear-

ance technology and employee knowledge of existing industry practices as well as the prevalence and severity of hazards represented by specific injury occurrence codes in accident/incident reporting statistics. FRA is responsible for determining what additional regulatory steps, if any, may be necessary in this area in light of overall safety considerations.

Third, the OSHA regulations would not apply to ladders, platforms, and other surfaces on signal masts, cantennary systems, railroad bridges, turntables, and similar structures or to walkways beside the tracks in yards or along the right-of-way. These are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety. Therefore, FRA will determine the need for and feasibility of general standards to address individual hazards related to such surfaces, keeping in mind the requirement of proper clearances and the familiarity of employees with existing industry designs.

In connection with considering the implications of the regulations that have been promulgated and published in the Code of Federal Regulations and the policy statement just quoted from the Federal Register, it is necessary to relate them specifically to the relief plaintiff seeks in these proceedings. The court, to accomplish that, turns initially to the complaint itself and the prayer for relief found at page four thereof, and will quote those parts deemed relevant for the purposes of the court's discussion of this issue:

WHEREFORE, plaintiff prays:

(a) For a declaratory judgment that the Michigan Occupational Safety and Health Act, as applied to plaintiff, violates Article VI, clause 2 of the U.S. Constitution which declares federal law to be supreme to state law; violates due process and equal protection under the Fourteenth Amendment; and violates Article I, section 8, clause 3 of the U.S. Constitution because it imposes a direct

and undue burden on interstate and foreign commerce.

(b) For a declaratory judgment that defendants have exceeded their statutory authority and have no jurisdiction to inspect or issue citations covering the tracks, roadway, walkways and associated facilities at plaintiff's rail yards.

(c) For a declaratory judgment that the MIOSHA citations issued to plaintiff and the attempted assertion of jurisdiction by defendants is null, void and of no effect.

(d) That defendants, and all officers, employees, agents and persons acting through or under them, be permanently enjoined from applying MIOSHA to plaintiff and from asserting jurisdiction over the tracks, roadways, walkways and associated facilities at plaintiff's rail yards and from attempting in any manner to enforce any citations already issued, or to make inspections of, or issue citations in connection with said facilities.

It would thus appear to the court in analyzing plaintiff's prayer for relief that the complaint can be legitimately construed to seek (1) a general declaration that MIOSHA is not applicable to plaintiff's railroad; (2) a more limited declaration that MIOSHA is not applicable to the tracks, roadbed and walkways of the plaintiff railroad; and (3) a declaration that the citations issued in this case are invalid. The court will now examine those three requests for relief, but will depart from the order in which they were initially enumerated.

█ The court, however, will start with the first request, and that is that there be a blanket declaration that MIOSHA is simply not applicable to this railroad because of preemption by the federal regulatory scheme. The court concludes that this broad request for relief should be rejected. The court reaches that determination for the following reasons.

First, the literal, plain meaning of the statute suggests and decrees to the contrary. It is clear from the section quoted hereinabove in this opinion that Congress has specifically recognized areas of state concern and allowed the states to legislate and regulate in the absence of federal action or in addition to federal action under the circumstances set forth in the statute.

Second, there are several cases that have dealt with this question of the interrelationship of the federal regulatory scheme with state schemes, and there is no case that has been cited to the court or that the court's own research has found which makes a blanket declaration that statutes such as MIOSHA are simply totally inapplicable to the railroad's operations. Additionally, there are cases specifically holding to the contrary. The court will not attempt to cite them at length, but will only reference one or two for illustrative purposes. To that end, the court cites *Southern Railway Company v. Occupational Safety and Health Review Commission*, 539 F.2d 335 (4th Cir.1976), and *Southern Pacific Transportation Co. v. Usery*, 539 F.2d 386, (5th Cir.1976).

Next, the court would note that the policy statement quoted from the Federal Register and issued by the federal agency itself recognizes a rule for regulatory concerns such as are expressed in MIOSHA and furthermore indicates that it would be foolish for the FRA, under the guise of regulating general railroad safety, to try to duplicate all of the employee safety regulations and inspections that are currently conducted by agencies such as OSHA or MIOSHA. The court finds this statement by the federal agency itself to be extremely persuasive of the fact that there is a clear recognition that there is a role for the states to play in this regulatory scheme. In connection with seeking broad relief, the plaintiff has implicated the supremacy clause of the Constitution. This clause is clearly not applicable, however, because Congress, in its declaration of intent, has indicated that area in which it would be supreme and that area in which it would defer to state regulatory measures.

Lastly, on this issue, the court would note that there has really been a complete failure of proof on the part of the plaintiff

to demonstrate any burden on interstate commerce, any denial of due process, or any denial of equal protection. For example, on the issue of burden on interstate commerce, the only reference that can even be deemed to be peripherally relevant is the reference to the fact that this railroad operates in thirteen states and Canada and has 7,500 miles of track. That certainly sets up a predicate for the argument that a plethora of conflicting state regulations could cause them a burden. But, other than setting up that predicate, there was no attempt made to carry the argument any further, there was no attempt to show conflicting state regulations, nor was there any attempt to show any burden at all placed upon the railroad in compliance, other than the implication that to require its personnel to participate in these inspections is time-consuming. That argument is really an attempt at bootstrapping because, if the regulations are validly enforceable against the railroad, it along with everyone else in business, is going to have to cooperate with the regulatory agency involved which will require some dissipation of man-hours that might be devoted to other activities but for the inspections. However, the fact that some minimal amount of man-hours might be implicated is not in and of itself an argument demonstrating an impermissible burden on interstate commerce.

It should be further noted that this was the first inspection made of this railroad facility. The inspector had never inspected any other railroad facility. The reason that the inspection took place was as a result of a complaint rather than pursuant to his general inspection powers. So, there is nothing in the record that would indicate that the State has or is about to embark on a series of detailed general railroad inspections which would be expensive in terms of time insofar as railroad personnel are concerned.

Thus, the court is compelled to conclude that any request for a broad declaration that MIOSHA is simply inapplicable across the board to this railroad's activities must be denied.

The court will now turn to what it listed initially as item number three, and that is a request that the citations issued herein be declared invalid.

Initially, the court would note that in the pleadings filed in this matter, the defendant has specifically raised the affirmative defense of a failure to exhaust administrative remedies. The MIOSHA regulations set forth a detailed procedure, fully comporting with any conceivable due process requirements, which allow a person receiving a citation to contest it. Without attempting to detail these procedures, suffice it to say that they include an informal dispute resolution procedure, a hearing before an administrative law judge, a review by a citizen review board, and then appeal from that final administrative decision to the state circuit courts and, under the applicable court rules of the State of Michigan, that would include an automatic appeal to the court of appeals.

Plaintiff concedes that they have not made any attempt to exhaust any administrative remedies, and attempts to excuse the failure to do so by citing to certain cases which indicate that there are exceptions to the exhaustion doctrine.

There is no doubt that there are a number of cases that deal with circumstances under which pursuing administrative remedies is not required as a prerequisite to initiating litigation. One such case relied on by the plaintiff is *Cerro Metal Products v. Marshall*, 620 F.2d 964 (3rd Cir.1980). In that case, the court first reviews those circumstances in which it is advisable to pursue administrative remedies and in which the court should make exhaustion a requirement and a prerequisite to instituting litigation, and then differentiates those circumstances from the fact situation presented in the case before it. The court would note, however, that the discussion in *Cerro*, as it relates to the facts in this case, fully justifies the application of the exhaustion doctrine. *Cerro* itself dealt with a fact situation entirely different from anything we are dealing with here. It dealt with the authority of OSHA to seek and get ex-

parte warrants when they had promulgated no regulations justifying such a procedure. It is easy to see how one could conclude that the administrative procedures set up would not be very helpful in resolving that issue. On the contrary, we are dealing here with what might be termed bread-and-butter violations of MIOSHA safety regulations, and they are the exact type that the administrative procedures are designed to deal with.

The court would further note that it finds the case of *Marshall v. Burlington Northern, Inc.*, 595 F.2d 511 (9th Cir.1979), to be analogous here. There, the court indicates that it is a prerequisite to administratively exhaust your remedies in fact situations which are much closer to what we are dealing with here than those presented in the *Cerro* case. The court would also note that the *Marshall* case is of significance because it indicates that one of the questions that can and should be raised in the administrative proceedings is that of the jurisdiction of the agency itself to proceed. To the degree that the plaintiff has suggested that where jurisdiction is being questioned there is no requirement for exhaustion, the *Marshall* case would certainly be specific authority to the contrary.

█ The court would further note that the Michigan Court of Appeals, in the case of *Lanzo Construction Company, Inc. v. Department of Labor*, 86 Mich.App. 408, 272 N.W.2d 662, (1978), has indicated that the department, in terms of administrative contests, has a right to grant delayed appeals. Thus, although it is clear at this juncture that an appeal would no longer be timely under the time sequence set forth in the regulations, there is a provision for delayed appeals. The court thus concludes on this issue that the plaintiff has failed to exhaust its administrative remedies. Insofar as the prayer for relief asks this court to make specific declarations relative to the citations themselves, this court's holding is that this court has no jurisdiction to do so because of plaintiff's failure to exhaust its administrative procedures.

█ The last item in plaintiff's prayer for relief must be construed in a manner consistent with what the court believes was the thrust of plaintiff's trial efforts and what was argued to the court in closing argument. This last request relates to a more limited declaration that the track surfaces, the roadbed, and the walkways are off limits insofar as MIOSHA is concerned. Insofar as rails and track surface, including cross ties and ballast and all adjacent switches and appurtenances are concerned, this court has no trouble in concluding that the federal regulations do treat this subject matter, that they treat it comprehensively, and that there has been a clear indication of an attempt to regulate in these areas in a manner which would preempt state regulation.

To that end and in reaching that conclusion, the court again looks to the Code of Federal Regulations (Exhibit 8 in this trial record), the policy statement of the agency itself, and what seems to be the totality of what is intended as gleaned from the subject matter dealt with, as well as the specific references contained therein. For example, although in the section dealing with track geometry one can find little literal language that helps in the resolution of this case, that section, read in conjunction with all of the other related sections, indicates that the FRA has taken under its wing the area of the track, the track roadbed, and such related features as ballast, cross ties, switches, frogs. However, there is nothing in the citation issued that really deals with in-place ballast, or rails, or switches, or frogs, or cross ties, or things that relate to the surface of the track and its roadbed itself. There are matters, however, that do implicate the so-called walkways. Now, in that regard, there is, of course, the statement in the FRA policy statement that walkways are an area which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety.

Given the record that was made in this case, including the photographic evidence

which demonstrates the relationship of the walkways to the railbed, given the general construction of the roadbed and the rail system itself, this court concludes—with an important qualification to be elaborated on subsequently—that the walkways are a part of the track structure and rail system that in general present an area preempted by the FRA and are immune from further regulation by state agencies.

One of the reasons that the court concludes that that is the case is that what is referred to loosely as a walkway is not necessarily what one unfamiliar with railroad operations might conjure up to be a walkway. We are not talking about clearly-defined areas. They are not delineated by markings, fencings, railings, anything of that nature. It appears that a walkway really is that clear area between parallel rails which is not occupied by the cars which overhang the track themselves, and is really the area in which one could safely walk without getting hit by a railroad car or an appurtenance thereto. To the degree that they are delineated at all, they are delineated in the same way that a path through a vacant lot is formed where a number of footsteps have trod the same area; they leave their impression, and so there is sometimes some physical demarcation.

Thus, to the degree, for example, that the State would attempt to require some specific kind of surface on the walkways or would attempt to keep cross ties in place on the track from extending into the walkways, or would attempt to tell the railroad what kind of ballast they must cover the exposed end of the railway ties with, this would all be construed by this court to be within the area that is preempted. This would not only include an affirmative request of the State, for example, such as to blacktop the walkways, but would also preclude the State from complaining of generally poor surface conditions such as a muddy walkway or a stony walkway. I think that principle is illustrated by the decision of *Black v. Baltimore & Ohio Railroad Co.*, 398 N.E.2d 1361 (Ind.App.), which dealt specifically with a claim and complaint filed relating to muddy walkways. The state agency as well as the state court both ruled that this was outside the regulatory agency's purview. This court indicated, however, that there was a qualification to its ruling as it relates specifically to walkways. And that qualification, which the court will first state and then elaborate on, pertains to matters or materials of a casual or temporary nature which might find their way into the walkway. This could present an entirely different situation which would not be preempted and would not be protected from State intervention.

The court can best illustrate that point by example. As indicated, a complaint about the surface of the walkway—for example, that it is muddy or that it is uneven, or that ballast from the track has spilled over to it—would not be within the purview of the state agency. A complaint, on the contrary, that said that exposed containers of radioactive material presenting an immediate danger to life and limb were positioned temporarily in the walkways would be actionable by the state agency. The court believes that this interpretation comports, first of all, with common sense, and, secondly, it seems to the court that it also comports with the statutory definition as it relates to "reducing an essentially local safety hazard."

In the example that I gave of a hazardous material resting in the right-of-way on a temporary basis, no principle of uniformity of regulation would be served by allowing it to remain there. I am sure that the railroad would not claim that they allow radioactive material in the walkways in all their yards in all of the states, or that it was pursuant to some standard regulation or policy or guideline for operating procedures. Where there are these temporary dangerous situations, it seems to me that they are of local concern. This record reveals that there are FRA inspectors and inspections, but the record is silent as to what they cover, the immediacy with which they can respond, and all related questions of that nature; whereas, the State, particularly in its capacity to respond on com-

plaint, is on the scene and is best able to address those particular local concerns that are of an immediate safety hazard nature.

The court is suggesting that a balance has to be struck between the general preemption of the federal regulation as it relates to the roadbed (which the court construes to include the adjacent walkways) and the matters of more immediate local concern as they might relate to some hazard not specifically related to railroad purposes or railroad rolling stock.

By way of further guidance, although the court has indicated that it would not address itself specifically to the citation involved here for the reasons stated, it would, nonetheless, indicate how the application of the principles the court has set forth here today would impact upon the citation that was issued.

1.  *The requirement of the posting of the MIOSHA poster.*

    ■ The court believes there is no question as to this being a permissible state requirement. The court having concluded that there is an area of concern for MIO-SHA separate and apart from any area that might be preempted, it follows automatically that the employees are entitled to have the protection that flows from the specific notice of MIOSHA which is accomplished by the requirement that such notices be posted.

2.  *Insure that materials, including scrap and debris, are piled, stacked, or placed in a container so as not to create a hazard.*

    ■ Dealing with this as an abstract proposition, the court would find that that area of concern is not preempted by the federal regulatory scheme. Now, returning to the specific citation, that general statement is further elaborated on by indicating that it relates specifically to "24 ties laying around yard between tracks 7 and 8 and 9 west bound." The court feels that here there is simply an inadequate record to fully determine this issue in the manner that it could be determined if appropriate

administrative procedures had been followed. It is not clear to the court whether these ties are in some way an integral part or about to be an integral part of a railroad repair or a railroad construction. If they are, generally they would not be within the purview of MIOSHA. If, on the other hand, they are discarded and are merely a product of sloppy housekeeping and they do in fact constitute a hazard, then this court would conclude they are not off limits to MIOSHA.

3.  *Maintain floor free of slip and trip hazards.*

    Again, as a general statement, the court believes this concern is with the purview of MIOSHA and believes that the policy statement quoted from in the Federal Register as it relates to OSHA and MIOSHA indicates clearly that this area of concern would not be preempted. Unfortunately, the issue here is further complicated by the parenthetical particularization on the citation which references "large rocks, broken ties and air hose stuck in ground in yard work and walk area." I think, again, I would have to treat this the same way I did the earlier issue. Whether this would be a violation would have to be judged in an administrative proceeding that dealt with what facts underlying the citation constitute the offense that is charged. By way of general guidelines again only, if we are talking about items just strewn at random around the yard which have no relationship to the track or the rail roadbed or an operational function that is ongoing at that particular time and they further constitute a hazard as opposed to an eyesore, then this would be within the proper purview of MI-OSHA.

4.  *Guard floor hole.*

    Again, as an abstract principle, guarding floor holes is within the purview of MIO-SHA. The problem here is that the parenthetical particularization in this item references "holes in yard where railroad ties had been replaced and area around ties not filled in." This implicates specifically the

roadbed and, under the court's previous ruling in this bench opinion, the court would construe that these are within the area fenced off from MIOSHA concern and could not be appropriately the subject of a citation.

It should be noted further that the test of preemption is not whether a hazard exists or not. Admittedly, in certain preempted areas, a MIOSHA inspector could go out and say there is a hazard in the roadbed, and no reasonably-minded person could disagree with him. But the test of preemption is broader than that. If the area itself is precluded from regulation, then that preclusion would be binding on MIOSHA.

The court believes that that resolves the issues presented by this litigation. The court will prepare its own judgment embodying its rulings in this matter. No costs will be awarded to either side because the court believes that significant public questions are implicated in this proceeding and that, in such circumstances, it is appropriate to award costs to neither side. Also, neither side has completely prevailed.