**MISSOURI PACIFIC RAILROAD COMPANY, et al.**

v.

**RAILROAD COMMISSION OF TEXAS, et al.**

Civ. No. A–86–CA–406.

United States District Court, W.D. Texas, Austin Division.

Sept. 5, 1990.

protection under a statute designed to reduce    their relative economic strength.

Robert B. Burns, Jr., Karl G. Johnson, Jr., Wilson, Grosenheider & Burns, Austin, TX, for plaintiffs.

Douglas B. Fraser, Atty. General's Office, Energy Div. Transp., Austin, TX, for defendants.

## ORDER

NOWLIN, District Judge.

This cause came before the Court on remand from the Fifth Circuit Court of Appeals for a trial on the merits. On July 22, 1986, Plaintiffs filed their Complaint in this Court seeking declaratory and injunctive relief. The Defendants timely answered, and on October 1, 1986, the Plaintiffs filed their motion for partial summary judgment. The Court granted the motion for partial summary judgment on January 27, 1987, which was published as *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 653 F.Supp. 617 (W.D.Tex.1987), and the Defendants appealed. The Fifth Circuit reversed and rendered in part, affirmed in part and reversed and remanded in part. *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 833 F.2d 570 (5th Cir.1987).

The Fifth Circuit reversed and remanded on the issue of whether 16 Tex.Admin.Code § 5.619, requiring the construction of walkways in areas on or immediately adjacent to the railroad track roadbed, is preempted by federal regulations regulating the roadbed, track geometry and track structure. Specifically, the Fifth Circuit found that summary judgment was improper because there was a material issue of fact concerning "the interrelationship between the state walkway requirement and federal track regulations." *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 833 F.2d 570, 575 (5th Cir.1987).

By Amended Complaint, filed on August 19, 1988, Plaintiffs have asserted five causes of action, alleging: (1) that the walkway rule is preempted by the Federal Railroad Safety Act, 45 U.S.C. §§ 421–441, and its attendant regulations, by total federal occupation of the subject matter; (2) that the walkway rule is preempted by the Federal Railroad Safety Act and its attendant regulations by failure to address a local safety hazard; (3) that the walkway rule is preempted by the Federal Railroad Safety Act and its attendant regulations for creation of an undue burden on interstate commerce; (4) that the walkway rule is constitutionally impermissible for creation of an undue burden on interstate commerce; and (5) that the Commission's adoption of the walkway rule was an arbitrary and capricious action, unsupported by substantial evidence.

The Plaintiffs' first four causes of action seek essentially the same relief, a declaration by this Court that the Texas walkway rule is preempted by federal law, and an injunction against its enforcement. Only the rationale for each of the first four causes of action differs.

On January 16, 1989, the parties submitted trial briefs in anticipation of a trial before the Court. On January 19, 1989, the parties filed a Stipulation By All Parties, stating that they were in agreement that "[t]he nonjury trial on the merits of this cause [would] be submitted solely on written documentation" of evidence, including affidavits or verified statements, depositions, exhibits, interrogatories, requests for admissions and responses

thereto. The Court signed the stipulation and requested that the parties submit final arguments, which were to include the parties' evaluation of the evidence submitted.

On August 23, 1990, a hearing was held, during which the parties were given an opportunity to orally evaluate their own and their opponent's evidence and present oral argument on the issues of law before the Court. At the conclusion of the hearing, the parties were asked to submit proposed findings of fact and conclusions of law in support of their relative positions.

In the first subsection of this opinion, the Court will first discuss generally the issue of preemption as it applies to this case. In the following subsections, the Court will make findings of fact and conclusions of law based on all the documented evidence and legal arguments presented to the Court.

## I. PREEMPTION

■ The Supremacy Clause, U.S. CONST. art. VI, cl. 2, nullifies state laws that "interfere with or are contrary to" federal law. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.). Congress is authorized to absolutely preempt state rulemaking authority in a particular area. *Pacific Gas & Electric Co. v. State Energy Resources Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Thus, if it appears that the federal statutes and related regulations in this case completely occupy the field of rail safety, including roadbed, track structure and walkways, all state regulation in this field would be preempted. The operative federal statute relating to this issue is the Federal Railway Safety Act ("FRSA"), 45 U.S.C. § 421–441. In the FRSA, Congress specifically declared that regulations relating to railroad safety shall be nationally uniform "to the extent practicable." Section 434 of the FSRA provides:

> The Congress declares that laws, rules, regulations orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law,

rule, regulation, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

■ Under the terms of section 434, if, in light of Congressional policy and FRA actions, there is a national rule, regulation, order or standard that has been adopted "covering the subject matter" of the state regulation, section 5.619 is preempted. If federal legislation and regulations merely address rail safety matters, but do not wholly occupy the field, section 5.619 would be permitted only if: (1) necessary to eliminate or reduce an essentially local safety hazard; (2) not incompatible with any federal provision; and (3) not creating an undue burden on interstate commerce. The state would be required to establish each of the elements of this narrow exception in order to avoid preemption.

## II. PLAINTIFFS' FIRST CAUSE OF ACTION

Addressing Plaintiffs' first cause of action, the Court must determine from the evidence and arguments presented whether 16 T.A.C. § 5.619 is preempted by a total federal occupation of the field, or more specifically whether the FRSA and its attendant regulations, 49 C.F.R. part 213, have "covered the subject matter" of section 5.619.

■ In the appeal of this case, the Fifth Circuit took a pragmatic as well as a legal approach in addressing whether a national rule, regulation, order or standard has been adopted "covering the subject matter" of the challenged state regulation. 833 F.2d at 573, 574. In remanding the case, the Fifth Circuit stated, "if, from a practical standpoint, the width, surface and slope requirements of

the state walkway regulation generally add to the FRA standards by requiring the railroad to strengthen or enlarge the roadbed beyond FRA requirements ... we [would] hold that the federal regulation has 'covered the subject matter' of track composition and design and that the state regulation conflicts with § 434's purpose to foster national rail safety standards 'to the extent practicable.'" 833 F.2d at 575. This Court, then, in determining whether federal law covers the subject matter of section 5.619, must determine from the evidence before it whether, from a practical viewpoint, the state walkway rule would have the effect of adding to the FRA standards by requiring the railroads to strengthen or enlarge the roadbed beyond the FRA requirements.

Section 5.619 requires the construction of walkways in areas on or immediately adjacent to the roadbed. By definition, these walkways shall be constructed "alongside a railroad track or railroad switch...." 16 T.A.C. § 5.619(a). Section 5.619 subsection (b) states:

> Walkways shall be located along tracks in yards, terminals, and at other points where switching, car spotting, or train or car inspections may reasonably be expected to be performed during the normal course of business.

16 T.A.C. § 5.619. Walkway surface slope and width specification are established in subsections (c), (d) and (e). Subsections (f), (g), (h) and (i) detail specific locations where walkways are required.

The walkways required by state regulations sit atop and adjoin the roadbed for which FRA has prescribed minimum specifications. The FRA has adopted comprehensive regulations that govern standards for the roadbed, track geometry and track structure, and specifically covers areas "adjacent to the roadbed" as well as track gauge, alignment, surface, ballast, drainage and component parts. 49 C.F.R. 213.31–213.143 (1989).

### A. Plaintiffs, Evidence

Plaintiffs have submitted the report of Robert E. Ahlf to demonstrate the engineering and economic impact of § 5.619 on the Texas Class I railroads. Mr. Ahlf is a self-

employed Railway Development Consultant who obtained a Bachelor of Science degree in Civil Engineering in 1966 from the University of Florida and a Master of Science degree in Transportation, which included a minor in Railway Civil Engineering, in 1968 from the University of Tennessee. Mr. Ahlf's postgraduate emphasis on Railway Civil Engineering was under the tutelage of Dr. W.W. Hay, nationally recognized as the primary contemporary authority in American railway engineering.

After obtaining his postgraduate degree, Mr. Ahlf spent seventeen years with the Illinois Central Gulf railroad, working his way up through positions including Assistant Division Engineer and Chief Operations Planner. During the last ten years with the ICG railroad, Mr. Ahlf's duties included direct field responsibilities for rehabilitation of hundreds of miles of mainline track through open country and through yards and cities; he also was responsible for the basic field engineering and design to rehabilitate and reconfigure two major ICG yards and its main thoroughfare trackage in Jackson, Mississippi.

Since leaving the ICG in 1985, Mr. Ahlf has been retained on several occasions to evaluate design and costs of rehabilitation projects on various railroads, including industry trackage. Mr. Ahlf has also served as committee chairman for a research project for the Association of American Railroads entitled "Ballast and Subgrade Interaction Considerations—Report No. AP139," published by the AAR Technical Center for the Research and Test Department of the AAR in December of 1988. In short, Mr. Ahlf's entire professional career has centered on railroad engineering, including analysis, design, field supervision, economic justification and preparation of specifications and contracts.

Mr. Ahlf's report is based on extensive factual data contained in survey forms and verified statements prepared by railroad operator witnesses. The Court is in possession of these verified statements and survey forms submitted by R.D. Bredenberg, Gary

Lilly, J.B. Miller, Donald M. Tate, and Larry Fields.

Mr. Ahlf explains in his report that the basic components of track structure are the rail, ties, ballast and subgrade (or roadbed).[1] The roadbed supports the ballast, including the ballast outside the ends of ties, which provides lateral restraint to the tie/rail structure. Railroads are designed and built to be perpetually renewed by maintenance on a cyclical basis, with individual components replaced periodically and the track lifted and surfaced on new stone ballast, according to Mr. Ahlf.

In Mr. Ahlf's opinion, railroads utilize large, open-voided stone ballast because such large ballast affords greater strength for the lateral, vertical and horizontal forces of rail traffic and maximum drainage capability. Track structures must not only drain water away from the ties and rails so as to prevent the softening of the roadbed, but must also provide for the escape of abraded materials, the fine materials created by the rubbing together of the ballast materials caused by rail traffic. Retention of these abraded materials around ties clogs the voids between ballast stone, tending to trap water in the track structure, according to Mr. Ahlf.

Mr. Ahlf claims that the walkway rule would require the use of a smaller size ballast than that generally used by the railroads, and that routine maintenance will cause the smaller walkway material to become mixed with the ballast material under the track, to the detriment of the track structure. The smaller walkway material, he explains, will adversely affect the drainage of the track structure. Without proper drainage, the track structure is softened and, thus, weakened.

Mr. Ahlf also explains that in at least 41% of the trackage on which walkways would have to be built, the track structure itself would have to be enlarged in order to support the walkway structure. According to this expert, walkways would extend six feet from the end of the railroad tie on both sides of the track, requiring that the roadbed and ballast be enlarged outwardly, substantially in excess of FRA requirements. His report also states that the enlargement of the roadbed and ballast would have to be compatible with the existing roadbed and ballast in such a way as to make them structurally integrated with the existing roadbed and ballast.

In sum, Mr. Ahlf concludes, that the walkway rule would require the strengthening and enlargement of the existing roadbed in a manner that would make the walkway structurally integrated with the existing roadbed and track structure; and the use of material in the walkway, which, in time, would weaken the railway's ability to handle rail traffic stress and provide adequate drainage capability.

Plaintiffs also submitted an opinion letter from the Chief Counsel of the U.S. Department of Transportation, Federal Railroad Administration, Mr. John M. Mason, concluding that the FRA has acted so as to occupy the subject matter of section 5.619. Mr. Mason cites 49 C.F.R. 213 as an FRA provision that prescribes minimum requirements for areas "immediately adjacent" to the roadbed, which although not expressly addressing walkways, would include the walkway area as an area immediately adjacent to the roadbed. He further argues that the FRA currently requires the correction of defective walkways on signal structures under the authority of the Signal Inspection Act. 49 U.S.C. § 26(e).

Plaintiffs have also submitted a 1983 FRA Safety Assessment of Plaintiff, Southern Pacific Transportation Company's Englewood Yard in Houston, and a 1983 Special Assessment of Plaintiff, The Atchison, Topeka and Santa Fe Railway Company's Southern Division, both of which, according to Plaintiffs, demonstrate the FRA's practical involvement in the correction of unsafe existing walkways pursuant to their jurisdictional authority under the Federal Railroad Safety Act.

Chief Counsel, Mr. Mason, also cites to a Policy Statement in which the FRA ex-

---

1. The term "ballast" refers to a "permeable, granular material such as sand, gravel, crushed rock, or slag, chat, cinders, and so on, placed around and under the ties to promote track stability." William W. Hay, *Railroad Engineering*, 1983, 2nd ed. page 393.

pressed its policy that other government entities should be precluded from exercising jurisdiction with respect to areas beside the tracks in yards or along the right-of-way. This area would include the area occupied by walkways. The following is an excerpt from the FRA's policy statement:

> These are areas which are so much a part of the operating environment that they must be regulated by the agency with the primary responsibility for railroad safety. Therefore, FRA will determine the need for and feasibility of general standards to address individual hazards related to such surfaces, keeping in mind the requirement of proper clearances and the familiarity of employees with existing industry designs.

Policy Statement of Termination of Rulemaking on Railroad Occupation Safety and Health Standards, 43 Fed.Reg. 10,583, 10,587 (1978).

Plaintiffs argue that, while not controlling, advisory opinions by officers of a federal agency are "entitled to great deference." *Regents of the University of California v. Public Employment Relations Board,* 139 Cal.App.3d 1037, 1042, 189 Cal.Rptr. 298, 301 (1983), *appeal after remand* 182 Cal.App.3d 71, 227 Cal.Rptr. 57 (1986), *review denied* 1986 (citing *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)).

### (B) *Defendants' Evidence*

Defendants offered the report of Dr. W. Ronald Hudson, who is the Dewitt C. Greer Centennial Professor of Transportation Engineering, in the Department of Civil Engineering at the University of Texas. Dr. Hudson obtained his Bachelors degree in Civil Engineering from Texas A & M University in 1954. He was selected as recipient of the Humble Fellowship in Civil Engineering and completed his Master's degree in Soil Mechanics in 1955. In July of 1955, he entered the U.S. Air Force and spent the next two years as a field engineer in the Air Defense Command doing varied field engineering work in the general area of Civil Engineering. Following the completion of his military service, he went to work as a Soils Engineer for S.J. Buchanan and Associated in Bryan, Texas. In 1958, he accepted employment as the Assistant Chief of the Rigid Pavement Research Branch at the AASHO Road Test (American Association of State Highway Officials) in Ottawa, Illinois. Completing that job, in 1961, he was employed with the service of the Texas Highway Department, where he worked as a supervising and designing engineer for two and a half years, while working on his doctoral degree. His doctoral degree was earned under Professor Hudson Matlock at the University of Texas in the field of engineering mechanics. In 1963, he entered the teaching/research profession at the University of Texas at Austin and has continued in that profession until the present. He is regularly requested as a lecturer all over the world. He is also currently the Technical Director/Manager of a major $6 million project for the $150 million Strategic Highway Research Program. His main areas of expertise are systems analysis, bridge management, load carrying theory and practice in civil engineering, including embankments and roadbeds with primary application in the highway field.

Defendants also presented evidence in the form of verified statements from Mr. Paul W. King, a regulatory analyst for the California Public Utility Commission; Mr. Robert W. Farnsworth, rail safety planner for the Railroad Commission of Texas; and, Mr. Vence L. Haggard, a federally certified Railroad Safety Inspector for the Railroad Commission of Texas.

Dr. Hudson, in his verified statement, claims that walkways would not be an integral part of the track structure. From a general engineering point of view, he explains, a walkway could be added or removed from an existing track structure without affecting the load bearing capacity of the track. With respect to the issue of drainage, Dr. Hudson states that the key to good drainage is the use of "open grade" stone, or stone that is all about the same size, and that walkways constructed of such crushed stone, not exceeding 1½″ in diameter, would provide exemplary drainage. He claims that stone graded from 1″ to 1½″ is so permeable that

water flows through it at the rate of nearly four miles (20,000') per day. Thus, water that falls on the track would only be in contact with the walkway material less than one minute before draining safely away from the track structure. This type of drainage, Dr. Hudson states, is not only adequate, as required by the federal regulations for track structure, but is excellent.

Dr. Hudson states that walkway stone would not be subject to the dynamic pumping from trains that the ballast stone receives and, thus, would exceed the drainage capabilities of the adjoining track structure. He claims that the issue of whether periodic maintenance of tracks with walkways will adversely affect the ballast structure is wholly in the hands of the railroads, and that if mixing the walkway material with ballast during removal for ballast cleaning is detrimental to the ballast, the railroads simply should not do so. At his deposition, Dr. Hudson suggested that a proper size screen could separate the two materials. Moreover, Defendants argue that the railroads are fully capable of dealing properly with track that has adjacent walkways because, based on the verified statements of Plaintiffs' experts, Mr. Bredenberg and Mr. Miller, the railroads currently maintain many miles of track with walkways.

Consistent with Dr. Hudson's opinion, Mr. Haggard, a federally certified railroad safety inspector, states in his affidavit that "nothing in the [FRA's] Track Safety Standards is concerned with or addresses walkways, excessive dropoffs next to roadbeds, the prevention of slippery surfaces, uneven surfaces, or foreign objects on surfaces near tracks, or any other footing problems for railroad workers, which is the subject matter addressed in 16 T.A.C. § 5.619."

Mr. Haggard also claims that walkways are not part of the roadbed, which is that area of soil under the railway that structurally supports the track.[2] He states that walkways are merely areas that parallel the roadbed and provide railroad employees a safe place to perform their duties. He also claims that roadbeds would not have to be widened or extended to support the walkway because "walkway fill" could be used to support the walkway. He further adds that walkway material would not interfere with adequate drainage because it would not be located in the cribs between the ties, as the ballast material is, and would not perform the same function as ballast. In sum, Mr. Haggard concludes that the federal regulations apply only to the structure which bears the loads created by train traffic, and that the existence of the walkways would not affect the load bearing portion of the track, or the drainage capacity of the ballast.

(C) *Findings of Fact*

The experts on both sides present the Court with persuasive arguments. The Court finds more persuasive the testimony and evidence presented by Plaintiffs' experts. The Plaintiffs have adequately demonstrated, through the opinion letter of the Chief Counsel of the FRA, through policy statements of the FRA, and through the practical involvement of the FRA in inspecting the areas adjacent to the roadbed, that it is both the policy and practice of the FRA to govern safety standards in the area immediately adjacent to the roadbed, including the area encompassing the walkway.

Moreover, from the exhibits and testimony presented to the Court by Plaintiffs, the Court is of the opinion that the roadbed would, in fact, have to be enlarged laterally and strengthened in order to support the walkway. Mr. Haggard's opinion on this issue is that the roadbed would not have to be extended because fill material could be used to support the walkway. Nevertheless, it has become clear to the Court, from all the evidence before it, that whether the extension of the roadbed is called "fill" material or "roadbed" material, the body of material used to support the walkway would have to adjoin the roadbed in such a way that it

---

**2.** Mr. Haggard relies on a definition of "roadbed" taken from the American Railway Engineering Association Manual for Railway Engineers. The Manual states: "The roadbed consists of that zone of soil or rock which supports loads from the track structure and is subject to weathering and deterioration from traffic loads." Volume I, page 1–1–30.

would be integrated with it and, in essence, merely become an extension of it.

Accordingly, the Court finds that the evidence and reports submitted by Plaintiffs' experts on the issue of the extent to which the walkway and extended roadbed would be integrated with the existing roadbed and track structure are more credible than the evidence and reports submitted by Defendants experts on this issue. The Court rejects the argument that the walkway requirement is a rule with independent application from the federal regulations and that compliance with the walkway rule would have no impact on compliance with the federal regulations. It is a specious argument to say simply that section 5.619 merely requires a walkway and that it is up to the railroads to comply by whatever means or cost necessary.

Several other courts have found that walkway areas are necessarily a part of the track roadbeds and have held that state regulations covering these areas are preempted by 49 C.F.R. 213. *See, e.g., Norfolk and Western Railway Co. v. Burns,* 587 F.Supp. 161, 170 (E.D.Mich.1984); *Black v. Baltimore and Ohio Railroad Co.,* 398 N.E.2d 1361 (Ind.Ct. App.1980); *Black v. Seaboard Systems Railroad,* 487 N.E.2d 468 (Ind.Ct.App.1986).

In sum, the Court finds:

(1) A railroad track structure consists of rails, ties, ballast materials and roadbed;

(2) Federal regulations comprehensively cover the subject matter of rails, ties, ballast materials, roadbed and areas immediately adjacent thereto, and track structure drainage capability;

(3) 16 T.A.C. § 5.619 specifically requires construction of walkways adjacent to the roadbed, extending six feet from end of tie;

(4) The width, surface and slope requirements of section 5.619 would generally add to the FRA standards by requiring the railroads to strengthen or enlarge the roadbed beyond the FRA requirements;

(5) The width, surface and slope requirements of section 5.619 would require the extension of the roadbed and construction of the walkway in a manner that is compatible with the existing roadbed and track struc-

ture, thus making them an integral part of the existing roadbed and track structure;

(6) Roadbed maintenance practices necessarily involve the use of heavy machinery which would mix the top layer of ballast rock with subballast materials with the result that crushed rock used for walkways would be mixed with other ballast material during ordinary roadbed maintenance;

(7) Walkways constructed by the specifications of section 5.619 would require materials that would, because of continuous rail traffic and regular maintenance, have the effect of weakening the track structure, impair drainage, and in time, weaken the roadbed itself; and

(8) The Federal Railroad Administration has regulated walkway conditions in Texas in at least two instances by investigating and citing improper walkway conditions in Southern Pacific Transportation Company and The Atchison, Topeka and Santa Fe Railway Company Texas yards.

### D. *Conclusions of Law*

The Court makes the following conclusions of law. Plaintiffs have adequately demonstrated through all the evidence presented, through the opinion letter of the Chief Counsel of the FRA, through the policy statements of the FRA, through 49 C.F.R. 213, and through the practical involvement of the FRA in the inspection and maintenance of the area adjacent to the roadbed, that the FRA has acted to completely occupy the field of railway safety specifically related to the roadbed, track structure, and walkways.

As a result, the Court finds that federal regulations cover the subject matter of 16 T.A.C. § 5.619. Section 5.619 of the Texas Administrative Code is, therefore, preempted by total federal occupation of the subject matter.

### III. PLAINTIFFS' SECOND CAUSE OF ACTION

In their second cause of action, the railroads assert that 16 T.A.C. § 5.619 is preempted for failure to address local safety hazards and for incompatibility with an existing federal law, rule, regulation, order or

standard. Having found that section 5.619 is preempted by federal occupation of the subject matter, the Court will now address the second cause of action in the alternative. As stated, if federal regulations do not wholly occupy the subject matter, a State may adopt an additional or more stringent law, rule, regulation, order or standard covering the same subject matter only: (1) when necessary to eliminate or reduce an essentially local safety hazard; (2) when not incompatible with any federal law, rule, regulation, order or standard; and (3) when not creating an undue burden on interstate commerce. *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1112 (5th Cir.1973), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).

Whether a hazard is local or statewide is a question that was addressed by the House Report on the Railroad Safety Act of 1970, which states in pertinent part:

The States will retain authority to regulate individual local problems or reduce essentially local railroad safety hazards. Since these local hazards would not be. Statewide in character, there is no intent to permit a State to establish Statewide standards superimposed on national standards covering same subject matter.

H.R.REP. NO. 1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.CODE CONG. AND AD.NEWS 4104, 4117.

The House Report indicates that safety hazards that are of statewide character were not meant to be included in the definition of purely "local" safety hazards. Several courts have also found that the "essentially local safety hazards" prong does not include the imposition of statewide standards. *See, e.g., National Association of Regulatory Utilities Commissioners v. Coleman*, 542 F.2d 11, 14–15 (3d Cir.1976); *Consolidated Rail Corp. v. Pennsylvania Public Utilities Commission*, 536 F.Supp. 653, 658 (E.D.Pa.), *aff'd mem.* 696 F.2d 981 (3d Cir.1982), *aff'd mem.*, 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983); *Atchison, Topeka and Santa Fe Railway v. Illinois Commerce Commission*, 453 F.Supp. 920, 926 (N.D.Ill.1977).

Based on the Railroad Commission's admission in response to Plaintiffs' request for admission, section 5.619 admittedly has statewide application. The rule addresses rail safety matters, the condition and composition of railroad track structures, which have in the very least, have been addressed by a federal law, rule, regulation, order or standard. Accordingly, the Court makes the following findings of fact.

### A. *Findings of Fact*

The Court finds that:

(1) 16 T.A.C. 5.619 is not a regulation that is necessary to eliminate or reduce an essentially local safety hazard;

(2) Based on the Court's findings related to the Plaintiffs' first cause of action, section 5.619 is not compatible with the FRA and its attendant regulations, which address the subject matter of 5.619, as it imposes additional and more stringent requirements on the track structure; more and different ballast materials; an enlargement and extension of the roadbed and ballast sections; and would impede the drainage capability of the track structure.

### B. *Conclusions of Law*

The Court finds that section 5.619 has failed the three part test of 45 U.S.C. § 434, in that it does not apply to an essentially local safety hazard, and in that it is incompatible with federal regulations addressing the subject matter of the rule. Accordingly, section 5.619 is preempted by a federal law, rule, regulation, order or standard, specifically, the FRSA and its attendant regulations, 49 C.F.R. 213.

### IV. PLAINTIFFS' THIRD AND FOURTH CAUSES OF ACTION

The Fifth Circuit, on appeal, stated that, [i]f the district court determines that the state walkway regulation is not preempted under the foregoing standard, it must then consider the railroads' remaining arguments concerning the walkway regulation not addressed in its original opinion." 833 F.2d at 576. Having found that section 5.619 is preempted on two alternative grounds, the Court finds it unnecessary to address Plaintiffs remaining causes of action. The Court

finds that the remaining causes of action are moot and HEREBY DISMISSES causes of action three, four, and five.

ACCORDINGLY, IT IS ORDERED that 16 T.A.C. § 5.619 is preempted by federal regulatory occupation of the subject matter, and for failing the three part test contained in 45 U.S.C. § 434.

IT IS FURTHER ORDERED that the Defendant Railroad Commission of Texas, its agents, servants, employees and attorneys are PERMANENTLY ENJOINED from enforcing 16 T.A.C. § 5.619.

IT IS FURTHER ORDERED that all parties shall bear their own costs and attorney's fees related to this case.