**SOUTHERN PACIFIC TRANSPORTATION COMPANY, Plaintiff,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, et al., Defendants.**

**No. C-86-2480-WWS.**

United States District Court,
N.D. California.

Nov. 3, 1986.

John MacDonald Smith, Ann Fingarette Hasse, Carol A. Harris, San Francisco, Cal., for plaintiff.

Janice E. Kerr, J. Calvin Simpson, Harvey Y. Morris, Public Utilities Com'n of State of Cal., San Francisco, Cal., Lawrence M. Mann, Alper, Mann & Reiser, Washington, D.C., F.L. Nelson, Hildebrand, McLeod & Nelson, Oakland, Cal., Paul A. Graham, Asst. Atty. Gen., Dept. of Justice, Salem, Or., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This is an action brought by Southern Pacific Transportation Company ("Southern Pacific") for declaratory and injunctive relief against General Orders Nos. 26–D and 118 issued by defendant Public Utilities Commission of the State of California ("CPUC"). Southern Pacific contends that the orders are preempted by the Federal Railroad Safety Act ("FRSA") and constitute an unreasonable burden on interstate commerce. CPUC has moved for summary judgment.

## STATEMENT OF FACTS

In 1948, CPUC adopted General Order No. 26–D. This order prescribes the minimum distances (clearances) railroads must maintain between freight cars and structures located above and beside railroad tracks and between parallel tracks. The part of the order challenged here provides that, with certain exceptions, "[t]he minimum distance between center lines of parallel standard gauge tracks shall be fourteen (14) feet." The order applies to tracks constructed or reconstructed after its effective date.

General Order No. 118 was adopted in 1963. That order requires railroads to maintain a two-foot wide continuous walkway on each side of their tracks. The order provides that "walkways shall provide a reasonable, regular surface with gradual slope not to exceed one inch to eight inches."

The purpose of both rules is to provide railroad employees with a safe working environment. General Order No. 26–D is designed to afford employees the minimum workspace necessary to avoid being crushed between trains moving on parallel tracks. General Order No. 118 is designed to provide employees with safe footing while working beside tracks.

Southern Pacific contends that the General Orders impose extraordinary costs and achieve only minimal safety benefits. Employees of Southern Pacific have submitted declarations stating that the company has experienced severe financial difficulties in recent years and that, as a result, the company lacks adequate maintenance funds. One employee states that the General Orders force Southern Pacific to divert scarce financial resources from important maintenance projects in other states to work in California which will result in little, if any, safety benefit to employees.

In addition, Southern Pacific challenges a specific decision of the CPUC finding that the company's Fresno switching yard has undergone reconstruction and ordering Southern Pacific to bring the yard into compliance with General Order No. 26–D. Because Southern Pacific cannot afford the $4,000,000 it would allegedly need to spend in order to bring the yard into compliance, it has ceased operations on thirteen tracks in the yard. According to Southern Pacific's General Manager for the Southern Region, this shut-down has resulted in delays of one day in some of the traffic which previously went through the yard.

CPUC has introduced substantial evidence that the General Orders provide a safer working environment for railroad employees. CPUC's Assistant Transportation Supervisor has submitted a declaration which explains in detail why the orders provide the minimum space necessary for

employees to perform their job functions safely. He describes fatal accidents that probably would have been avoided if tracks had complied with General Order No. 26–D's clearance requirements. And he cites statistics which demonstrate that poor footing near tracks is a major source of accidents. Moreover, CPUC has submitted evidence that tends to contradict Southern Pacific's contentions that its financial situation is precarious and that the Fresno Yard decision causes delays.

In 1970, Congress adopted the FRSA, Pub.L. No. 91–458, 84 Stat. 971 (1970) (codified as amended at 45 U.S.C.A. §§ 421–444 (West 1972 & Supp.1986)). The purpose of the FRSA is "to promote safety in all areas of railroad operations." 45 U.S.C.A. § 421 (West 1972). In order to accomplish that purpose, the act authorizes the Secretary of Transportation "to prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety." *Id.* § 431. The Secretary of Transportation has delegated that responsibility to the Federal Railroad Administration ("FRA"). 49 C.F.R. § 1.49(m) (1985).

The FRSA declares that railroad safety regulations "shall be nationally uniform to the extent practicable." 45 U.S.C.A. § 434 (West 1972). The act, however, allows state regulation of railroad safety in certain circumstances:

> A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

*Id.*

Pursuant to its delegated authority, the FRA has adopted a set of "Track Safety Standards." 49 C.F.R. §§ 213.1–.241 (1985). These standards set forth requirements for track geometry, structure, and inspections. *Id.* They also establish two requirements for the roadbed supporting railroad tracks. Roadbeds must have adequate drainage, and vegetation on or near roadbeds must be controlled so that it does not obstruct visibility or interfere with railroad employees performing their duties. *Id.* § 213.37.

Between 1971 and 1978, the FRA pursued three rule making proceedings relating to safety concerns addressed by General Orders Nos. 26–D and 118. In its initial Notice of Proposed Rule Making (NPRM), the FRA proposed to adopt § 213.39 as part of its track safety standards. The proposed section provided: "If an object or hazardous condition within 10 feet of the center line of track impedes the safe passage of equipment or prevents railroad employees from safely performing their duties, the owner of the track shall remove the object or correct the hazardous condition or give appropriate warning notification." 36 Fed.Reg. 11,974, 11,976 (1971). After receiving comments on the NPRM, the FRA concluded that § 213.39 should not be adopted, "because its language was ... too vague to constitute an effective safety standard." 36 Fed.Reg. 20,336, 20,-336 (1971).

In 1976, the FRA published an advance NPRM asking for comments on the question whether the agency should adopt regulations requiring walkways on trestles and bridges. 41 Fed.Reg. 50,302 (1976). In 1977 the FRA decided that it would not adopt such a regulation. 42 Fed.Reg. 22,-184 (1977). The agency determined that the benefits of a nationwide requirement of walkways on those structures would be outweighed by the costs of the regulation. *Id.* at 22,185. The agency stated that "if an employee safety problem does exist because of the lack of walkways in a particular area or on a particular structure, regulation by a state agency that is in a better

position to assess local need is the more appropriate response." *Id.*

Finally, a 1975 advance NPRM announced the FRA's intention to adopt railroad occupational safety and health standards. 40 Fed.Reg. 10,693 (1975). It was contemplated that the standards would include regulations covering "track, roadbed, track appliances, and related devices." *Id.* After receiving comments, the FRA announced that it would adopt a comprehensive code of occupational safety and health regulations by issuing a series of NPRMs covering discreet subjects. 41 Fed.Reg. 29,153 (1976). The first NPRM in the series proposed regulations dealing with fire prevention, environmental controls, and means of egress to buildings used by railroad employees. *Id.*

In 1978, the FRA issued a "Policy Statement," which terminated this rule making proceeding and attempted to define "the relationship between the respective jurisdictions of the FRA and" the Occupational Safety and Health Administration of the Department of Labor (OSHA). 43 Fed. Reg. 10,583, 10,584 (1978). The FRA determined that a comprehensive code of occupational safety and health regulations directed specifically at railroads would unnecessarily intrude into areas adequately regulated by OSHA. *Id.* at 10,585, 10,587. At the same time, the FRA concluded that the safety of "railroad operations," which it defined as "the movement of equipment over the rails," should be "the responsibility of a single agency." The statement therefore set forth areas of railroad operations to which OSHA regulations should not apply. The FRA specifically determined that OSHA regulations on walking and working surfaces should not apply to "walkways beside the tracks in yards or along the right-of-way." *Id.* at 10,587. The Policy Statement indicated that the "FRA will determine the need for and feasibility of general standards related to such surfaces, keeping in mind the requirement of proper clearances." *Id.*

## DISCUSSION

### A. *Preemption*

The FRSA permits state regulation of railroad safety in two circumstances. First, state regulation is permitted as long as there is no federal rule, regulation, standard, or order covering the same subject matter. 45 U.S.C.A. § 434 (West 1972). Second, state regulation which does cover the same subject matter as federal regulation is permitted as long as it (1) is necessary to eliminate an essentially local safety hazard, (2) is not incompatible with federal regulations, and (3) does not create an undue burden on interstate commerce. *Id.* The CPUC acknowledges that the General Orders are statewide regulations which do not address an "essentially local safety hazard." The sole question with regard to preemption is therefore whether federal regulations or standards cover the same subject matter.

Southern Pacific advances three arguments in support of its contention that the General Orders are preempted. Its first argument is that the FRA's existing track safety regulations cover the same subject matter as the General Orders. None of the FRA standards, however, addresses the subject of track clearance covered by General Order No. 26–D. The FRA track safety regulations set forth requirements for individual tracks. They cover, for example, the subject of rail gage, which is the distance between rails in a track. 49 C.F.R. § 213.53 (1985). But they do not establish requirements for the distance between tracks.

Southern Pacific's contention that existing federal regulations preempt the CPUC's walkway requirements is somewhat more persuasive, but also ultimately unavailing. Southern Pacific has submitted evidence that the requirement of a two-foot wide continuous walkway requires extension of the ballast or subgrade. The ballast and subgrade are a track's supporting structure. Federal regulations set forth requirements for that structure. The FRA regulation on ballast requires that it:

(a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;

(b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

(c) Provide adequate drainage for the track; and

(d) Maintain proper track cross-level, surface, and alignment.

49 C.F.R. § 213.103 (1985). General Order No. 118 thus affects an area of railroad operations covered by federal regulations. Southern Pacific argues that the order is preempted, reasoning that if state and federal regulations affect the same area of railroad operations, then they cover the same subject matter under § 434. But the legislative history of the FRSA indicates that Congress's primary purpose in enacting that statute was "to promote safety in all areas of railroad operations." H.R.Rep. No. 1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4104 [cited as House Report]; *see also* 45 U.S.C.A. § 421 (West 1972). Congress's concern extended to the safety of employees engaged in railroad operations. House Report at 4106. Read in the light of that history, § 434 manifests an intent to avoid gaps in safety regulations by allowing state regulation until federal standards are adopted. State and federal regulations therefore cannot be held to cover the same subject matter unless they address the same safety concerns.

▪ FRA regulations and General Order No. 118 do not cover the same subject matter under this interpretation. The ballast regulations relied upon by SP are designed to insure that tracks have adequate support. The regulations dealing with vegetation on or near roadbeds are designed to insure that employees can perform necessary maintenance work. *See* 49 C.F.R. § 213.37 (1985). No FRA regulation addresses the concern that employees have a safe working environment near railroad tracks.

The conclusion that existing FRA regulations do not cover the same subject matter as the General Orders is consistent with circuit court opinions applying § 434 to other situations. In *National Association of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11 (3d Cir.1976), the court held that a state requirement that railroads file monthly accident reports was preempted by an FRA regulation which also required monthly reports. The Court indicated, however, that the state could require railroads to provide immediate notification of accidents. *Id.* at 15. In *Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108 (5th Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973), the court held that a city had no jurisdiction to require correction of track conditions which had allegedly caused derailments. The FRA's track safety standards addressed precisely the safety concerns which were the subject of the city's actions. *Id.* at 1112.

▪ Southern Pacific's second argument is that the FRA's rejection of safety standards addressing the subject of employee safety near railroad tracks preempts the General Orders. The general principle for which Southern Pacific argues is sound. Under the FRSA the rejection as well adoption of standards can preempt state regulation. In *Marshall v. Burlington Northern, Inc.,* 720 F.2d 1149 (9th Cir.1983), the Ninth Circuit held that the Boiler Inspection Act (BIA) preempted a state requirement that locomotives be equipped with strobe or oscillating lights. *Id.* at 1152–53. The court reasoned that the BIA occupied the field of locomotive equipment regulation and that the FRSA had not altered the BIA's preemptive effect. *Id.* With respect to the FRSA, the court stated that it "preempts only those state laws where the federal government has acted with respect to the same 'subject matter.'" *Id.* It went on to state:

The reasons we have given thus far suffice to determine this aspect of the case, but we note actions recently taken by the Federal Railroad Administration

(FRA). Over a five year period, the FRA studied the effectiveness of strobe and oscillating lights, and, at least at this point, it "has concluded that the information in the docket does not support the proposition that alerting lights are effective in reducing the incidents of grade-crossing accidents. Without that support, a Federal regulatory requirement that railroads equip their locomotives with an alerting light is not justified." 48 Fed.Reg. 20,257 (May 5, 1983). Under the statutory scheme we are here considering, where the FRA has rejected the requirement of strobe or oscillating lights, a state may not require them. " '[W]here failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such regulation." *Ray v. Atlantic Richfield Co.,* 435 U.S. [151] at 178, 98 S.Ct. [988] at 1004 [55 L.Ed.2d 179] (1978) (quoting *Bethlehem Steel Co. v. New York Labor Relations Board,* 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947)). The recent action of the FRA is support for the conclusion that the subject has been preempted by administrative action as of this date....

*Id.* at 1153–54. The *Marshall* dictum thus indicates that if after due consideration the FRA determines that a particular regulation is not justified, that determination has the same preemptive effect as the adoption of a regulation.

■ None of the instances in which the FRA has rejected regulations relating to employees' trackside working environment meet this standard. When the FRA decided not to adopt proposed regulation 213.39 relating to obstacles near tracks, it did not do so because it concluded that the regulation was not justified. Rather, the agency decided that the regulation was too vague to be effective. 36 Fed.Reg. 20,336, 20,336 (1971). When the FRA decided not to adopt a regulation requiring walkways on trestles and bridges, its reasons related

specifically to conditions affecting those structures. 42 Fed.Reg. 22,185 (1977). It did not conclude that a general requirement of walkways was not justified. Finally, in deciding not to adopt a comprehensive set of railroad occupational safety and health standards, the FRA came to no conclusion regarding the merits of clearance or walkway requirements. *See* 43 Fed. Reg. 10,583 (1978).

■ Southern Pacific's final argument in favor of preemption is that in the 1978 Policy Statement the FRA assumed jurisdiction over subjects covered by the General Orders. This argument is unpersuasive for several reasons. First, the Policy Statement attempted to delineate the respective jurisdictions of the FRA and OSHA. It did not purport to limit state jurisdiction. *See Burlington Northern Railroad Co. v. Nebraska,* 83–L–423, slip. op. at 5 (D.Neb. May 10, 1985), *rev'd on other grounds,* 802 F.2d 994 (8th Cir.1986). Second, the conclusion that the FRA's jurisdiction extended to walkways beside tracks, *see* 43 Fed.Reg. 10,583, 10,587 (1978), did not follow notice and comment rule making proceedings, as required by the statute, 45 U.S.C.A. § 431(b) (West 1972). Third, the Policy Statement indicated that the FRA would determine the need for walkway regulations in the future, 43 Fed.Reg. 10,583, 10,587 (1978); the FRA thus did not claim to have adopted regulations covering that subject. Finally, the Policy Statement does not mention clearances. Regardless of its effect on walkway regulations, it therefore cannot be said to preempt clearance standards.

Southern Pacific relies on two decisions holding that the FRA has preempted state walkway regulations. *Norfolk Western Railway Co. v. Burns,* 587 F.Supp. 161 (E.D.Mich.1984) (bench opinion); *Black v. Seaboard System Railroad,* 487 N.E.2d 468 (Ind.Ct.App.1986). These decisions are distinguishable but in any event rest on the arguments that the Court has here found to be without merit. The same is true of letters from FRA's General Counsel, sub-

mitted by Southern Pacific, offering his opinion that General Orders Nos. 26–D and 118 are preempted. For the reasons stated in this opinion, the Court declines to follow these authorities.

### B. *Commerce Clause*

■ While the commerce clause may be a restriction on state power to legislate, it is a source of authority for Congressional action. *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983). Thus, "[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause, even if it interferes with interstate commerce." *Id.*

■ To the extent General Orders Nos. 26–D and 118 are authorized by § 434, they are not subject to scrutiny under the commerce clause. Section 434 authorizes state regulation of railroad safety in two circumstances. First, a state regulation is authorized if it addresses a subject not covered by federal regulations. Second, a state regulation which is more stringent than federal standards is allowed if it addresses an essentially local safety concern and does not unduly burden interstate commerce. What is significant about the statutory scheme is that absence of burden on commerce is a specified condition to state authority to regulate only with respect to regulations that are more stringent than federal rules. Congress chose not to place this condition in the provision authorizing state regulations that address subjects not covered by federal regulations. Since the present orders are authorized under that provision whether they impose a burden on commerce is irrelevant.

Even if validity of the General Orders were assessed without reference to § 434 the result would be the same. The standard applicable to state regulations affecting interstate commerce is set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970): "Where the statute regulates evenhandedly to effectuate a legitimate local public inter-est, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *See also, Grand Canyon Dories, Inc. v. Idaho Outfitters & Guides Board*, 709 F.2d 1250 (9th Cir.1983), *cf. Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (striking down a state prohibition against the use of 65–foot double trailers on Iowa highways, subject to certain exceptions).

■ Southern Pacific's argument that the General Orders violate the commerce clause under this standard fails for two reasons. First, Southern Pacific has not shown that the orders burden commerce. Demonstrating that state regulations impose substantial costs on interstate operations is not sufficient to establish a burden calling for balancing under *Pike. Bibb v. Navajo Freight Lines*, 359 U.S. 520, 526, 79 S.Ct. 962, 966, 3 L.Ed.2d 1003 (1959); *Burlington Northern Railroad Co. v. Department of Public Service*, 763 F.2d 1106, 1114 (9th Cir.1985). Rather, a challenger to a state regulation must show that it "impedes substantially the free flow of commerce from state to state." *Burlington*, 763 F.2d at 1114. Southern Pacific has failed to do so.

■ Second, the CPUC has introduced substantial evidence that the General Orders provide a safer working environment for railroad employees. Southern Pacific has not raised a genuine issue of fact as to whether safety benefits result from the orders. Thus even if the orders were not authorized by Congress, there is no evidence from which it could be found that any burden the orders impose is clearly excessive in relation to the benefits they produce.

For the reasons stated, the motion of CPUC for summary judgment will be granted.

IT IS SO ORDERED.