Robert E. HATFIELD, Plaintiff,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant and Third Party Plaintiff,

v.

BINGHAM TRANSPORTATION, INC., Third Party Defendant.

No. 89–1529–K.

United States District Court, D. Kansas.

Feb. 7, 1991.

Timothy J. King, Stinson, Lasswell & Wilson, Wichita, Kan., for plaintiff.

Philip R. Fields, Wichita, Kan., for defendant and third party plaintiff.

Robert Nugent, Turner & Boisseau, Wichita, Kan., for third party defendant.

MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is a personal injury action brought by plaintiff Robert E. Hatfield against de-

fendant/third party plaintiff Burlington Northern Railroad Company (the railroad) for injuries sustained as a result of a truck/train collision at the Haverhill Road crossing on September 29, 1987. In a memorandum and order dated September 24, 1990, the court addressed counter-motions for partial summary judgment between the railroad and third party defendant Bingham Transportation, Inc.

This matter is now before the court on a motion for partial summary judgment filed by the railroad against the plaintiff. The railroad requests judgment against the plaintiff to the extent plaintiff's claim is premised on the railroad's failure to install active warning devices at the Haverhill Road crossing. As more fully set forth herein, the court finds that the railroad's motion for partial summary judgment should be denied.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable, such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510.

In considering a motion for summary judgment, this court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). Further, the party moving for summary judgment must demonstrate its entitlement beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985).

However, in resisting a motion for summary judgment, the nonmoving party may not rely upon mere allegations, or denials, contained in its pleadings or briefs. Rather, the party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations. *Burnette v. Dresser Industries, Inc.*, 849 F.2d 1277, 1284 (10th Cir.1988). Moreover, the moving party need not disprove plaintiff's claim, but rather, must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). That is, if on any part of the *prima facie* case there is insufficient evidence to require submission of the case to a jury, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex*, 477 U.S. at 323-24, 106 S.Ct. at 2552-53.

The following facts offered by the railroad in support of its motion are uncontroverted.

On September 29, 1987, a truck owned by Bingham Transportation and driven by plaintiff collided with the railroad's train at the Haverhill Road crossing in Butler County, Kansas. The plaintiff then brought this action against the railroad alleging, among other things, that the railroad was negligent in "[f]ailing to install active warning devices at the subject crossing to warn approaching motorists of train traffic on the crossing." (Pretrial Order, at p. 5.)

The railroad contends that a negligence claim based on its failure to provide active warning devices is preempted by federal

law. The railroad further asserts that under federal law the state, not the railroad, has the legal duty to determine the necessity of an improved warning device.

The State of Kansas receives, and for many years has received, federal highway funding pursuant to the Federal Highway Safety Act (23 U.S.C. § 101 *et seq.*).

The State of Kansas, through the Kansas Department of Transportation (KDOT), first inventoried the Haverhill Road crossing on May 1, 1972. KDOT did not recommend any improvements to the crossing as a result of that survey.

KDOT conducted an on-site inspection of the crossing on July 23, 1981 following a request from Butler County officials. KDOT did not recommend any improvements to the crossing as a result of that inspection.

In February 1984, KDOT updated its information regarding the crossing. As a result of this updated information, the crossing was placed on the improvement list for fiscal year 1985. On May 1, 1985, KDOT again conducted an on-site inspection of the crossing. As a result of the May 1985 survey, KDOT scheduled the crossing for improvements.

On December 11, 1987, Butler County officials sent a letter to KDOT indicating that on October 5, 1987, Butler County had agreed to participate in the installation of signals at the crossing. On December 28, 1987, KDOT approved a project to install signals at the crossing.

By letter dated December 28, 1987, KDOT supplied the railroad with copies of an agreement for the installation of straight post signals at the crossing and preliminary plans for installation. KDOT also informed the railroad that it would notify the railroad "in the near future to order the necessary material for this project."

On March 11, 1988, KDOT authorized the railroad "to order materials necessary for the warning devices." In that same letter, however, KDOT cautioned the railroad that "the actual installation of the warning devices cannot be undertaken until the agree-

ments are executed by all parties and we have authorized you to proceed."

Funds were obligated on March 2, 1988 and approved by the Federal Highway Administration (FHWA) on March 14, 1988. On March 21, 1988, KDOT authorized the railroad to begin work on the installation of signals at the crossing.

On March 22, 1989, KDOT issued a notice of acceptance of the improvements. The improvements, which were begun in 1988 and completed in 1989, were scheduled as a result of the on-site inspection on May 1, 1985.

Because KDOT schedules improvements well in advance, it normally takes approximately two years from the time of inspection until the improvements are actually made at any crossing. Because the Haverhill Road crossing was placed on KDOT's improvement list in 1984, the Kansas Corporation Commission had no involvement with any proposed improvements at the crossing.

## CONCLUSIONS OF LAW

The issue before the court is a narrow one. The railroad asserts that to the extent the plaintiff's claim is premised on the railroad's failure to provide additional or active warning devices at the questioned railroad-highway crossing, the plaintiff's claim has been preempted by the Federal Railroad Safety Act (FRSA). *See* 45 U.S.C. § 421 *et seq.*

For clarity, it must be noted that the plaintiff has alleged the following four separate contentions of negligence against the railroad: (1) failing to keep the subject crossing free from visual obstruction in the form of trees and shrubbery; (2) failing to install active warning devices at the subject crossing to warn approaching motorists of train traffic on the crossing; (3) failing to slow its locomotive when proceeding through the subject crossing; and (4) failing to institute additional safety precautions at the subject crossing, including "flagging the crossing," after the railroad received notification, in the form of a petition from its own employees, of the dangerous nature of the crossing. As the railroad

notes in its reply, only contention No. 2 is at issue in the current motion.

Determination of whether a duty exists is a matter of law for the court to decide. *Wicina v. Strecker,* 242 Kan. 278, 280–82, 747 P.2d 167 (1987). The railroad's common law duty in Kansas is relatively clear:

> [W]here unusually dangerous conditions prevail at a railroad crossing the unusual hazard may make additional warnings and precautions by the railroad company necessary. The crux of the matter is simply whether the railroad has afforded users of the crossing sufficient and adequate protection under the reasonably careful person rule.

*Sexsmith v. Union Pacific Railroad Co.,* 209 Kan. 99, 108, 495 P.2d 930 (1972). *Accord, Jennings v. Missouri Pacific Railroad Co.,* 211 Kan. 389, 394, 506 P.2d 1125 (1973) (also noted that the railroad's failure to provide a traffic control signal at a crossing may be considered as a factor which makes the crossing more than ordinarily dangerous).

It is well established that Congress has the authority, in exercising its Article I powers, to preempt state law, *California v. ARC America Corp.,* 490 U.S. 93, 100, 109 S.Ct. 1661, 1664, 104 L.Ed.2d 86, 94 (1989), and that preemption is primarily a question of congressional intent, *see Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). Furthermore, the Supreme Court has instructed that state law is preempted under the supremacy clause of the U.S. Constitution in three circumstances. *English v. General Electric Co.,* —— U.S. ——, ——, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990).

First, Congress can explicitly define the extent to which it intends to preempt state law in enacting the federal law in question. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95–96, 103 S.Ct. 2890, 2898–2900, 77 L.Ed.2d 490 (1983). Second, even in the absence of express preemptive language, a congressional intent to occupy an entire field may be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).[1] Third, state law is preempted to the extent it actually conflicts with federal law. *See, e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) (where it is impossible for a private party to comply with both the state and federal law); or *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

The railroad asserts that Congress clearly expressed a preemptive intent in the following provision of the FRSA:

> The Congress declares that laws, rules, regulations, orders, and standards *relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law,* rule, regulation, order, or standard *relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.* A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

is "'clear and manifest.'" *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

---

1. A congressional intent to totally preempt the field will only be inferred in areas that have "been traditionally occupied by the States," if the congressional intent to supersede state laws

45 U.S.C. § 434 (emphasis added). That section also states that the Secretary shall "prescribe, as necessary, appropriate rules, regulations, orders and standards for all areas of railroad safety."

■ A preliminary question which must be addressed is whether the duty to install active warning devices at a dangerous railroad crossing is a law "relating to railroad safety" so that 45 U.S.C. § 434 applies. Since finding solutions to the grade crossing problem was one of the few explicitly mentioned aspects of railroad safety in the FRSA, there can be little doubt that the duty to install active warning devices at dangerous railroad crossings is a law "relating to railroad safety" within the meaning of 45 U.S.C. § 434. *See* 45 U.S.C. § 433:

(a) The Secretary shall submit to the President for transmittal to the Congress, within one year after October 16, 1970, a comprehensive study of the problem of eliminating and protecting railroad grade crossings ... together with his recommendations for appropriate action including, if relevant, a recommendation for equitable allocation of the economic costs of any program proposed as a result of such study.

(b) *In addition the Secretary shall, insofar as practicable, under the authority provided by this subchapter and pursuant to his authority over highway, traffic, and motor vehicle safety, and highway construction, undertake a coordinated effort toward the objective of developing and implementing solutions to the grade crossing problem, ...*

(Emphasis added).

■ This court has previously noted in *Sisk v. National R.R. Passenger Corp.,* 647 F.Supp. 861, 864 (D.Kan.1986), a congressional intent to preempt state laws is evident from the plain language of 45 U.S.C. § 434. That is, by stating that "[a] State may adopt or continue in force any law ... relating to railroad safety until such time as the Secretary has adopted a rule ... covering the subject matter of such State requirement," it necessarily follows that a state may not continue in force any law which relates to railroad safety after the Secretary has adopted a rule covering the subject matter of the state law.

Further support for a finding that Congress intended to preempt state law by enacting the FRSA can be found in the following legislative history which evinces a congressional intent to establish a nationally uniform control of railroad safety:

The committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems.

. . . .

... [T]he railroad industry has very few local characteristics. Rather, in terms of its operations, it has a truly interstate character calling for a uniform body of regulations and enforcement. It is a national system.... To subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce.

H.R. Report No. 91–1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4104, 4109–11; and *CSX Transp. Inc. v. Public Utilities Com'n of Ohio,* 701 F.Supp. 608, 612 (S.D.Ohio 1988), *aff'd,* 901 F.2d 497 (6th Cir.1990).

As a result of the explicit language in § 434 and the legislative history thereto, the court finds that Congress has explicitly defined a preemptive intent in the FRSA. At a result, the first example of preemption set forth herein applies to this case. *English,* —— U.S. at ——, 110 S.Ct. at 2275, 110 L.Ed.2d at 74 (citing *Shaw v. Delta Air Lines, Inc.,* 463 U.S. at 95–96, 103 S.Ct. at 2898–2900 (finding that Congress had expressed an intent that the Employee Retirement Income Security Act, 29 U.S.C. § 1144, preempted state law). *See also CSX Transp., Inc. v. Public Utilities Com'n of Ohio,* 901 F.2d 497, 502 (6th Cir.1990) (finding that the FRSA reveals clear preemptive purpose); *Burlington Northern Railroad Co. v. State of Mont.,* 880 F.2d 1104, 1105–06 (9th Cir.1989) (state

regulation is preempted to the extent a Federal Railroad Administration regulation covers the same subject matter); *Missouri Pacific R. Co. v. Railroad Com'n of Texas,* 833 F.2d 570, 574 (5th Cir.1987) ("the scope of preemption under § 434 is informed by its introductory language directing the establishment of national rail safety standards 'to the extent practicable' "); *National Ass'n of Regulatory Util. Com'rs v. Coleman,* 542 F.2d 11, 13 (3d Cir.1976) (finding that the FRSA evinces a total preemptive intent); *Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108, 1112 (5th Cir.1973) (the FRSA only "authorizes a narrow spectrum of deviation from national uniformity"). *But see Karl v. Burlington Northern R. Co.,* 880 F.2d 68, 76 (8th Cir. 1989).

Although Congress clearly expressed an intent to establish nationally uniform control of railroad safety in the FRSA, this court recognized in *Sisk,* 647 F.Supp. at 865, that § 434 of that Act specifically authorizes "exceptions" from such uniformity. For example, the plain language of § 434 indicates that preemption does not occur until the Secretary of Transportation adopts "a rule, regulation, order, or standard covering the subject matter" of the state law. In addition, the state law will not be preempted if it is "necessary to eliminate or reduce an essentially local safety hazard;" is "not incompatible with any Federal law, rule, regulation, order, or standard;" and does "not creat[e] an undue burden on interstate commerce." 45 U.S.C. § 434.

Since no claim is made in this case that the duty to install active warning devices at railroad crossings is essentially a local safety hazard, the second "exception" for preemption discussed above does not apply and will not be addressed herein. As a result, the only question the court must address is whether the Secretary has adopted standards "covering the subject matter" of the duty to install active warning devices at railroad crossings where unusually dangerous conditions exist.[2]

The preemption provision in 45 U.S.C. § 434 is keyed to action taken by the Secretary.[3] Furthermore, the preemption provision in the FRSA does not merely relate to those regulations promulgated by the Federal Railroad Administration through powers delegated by the Secretary of Transportation; it relates to *all* rules and regulations regarding railroad safety *promulgated by the Secretary. CSX Transp., Inc.,* 901 F.2d at 501. *See also Burlington Northern Railroad Co.,* 880 F.2d at 1106, (the FRSA does not merely preempt state laws which are inconsistent with standards adopted by the Secretary; it preempts all state laws aimed at the same safety concern addressed by standards promulgated by the Secretary).

In asserting that the Secretary has adopted relevant standards in this case, the railroad points out that 23 C.F.R. § 655.601(a) (1990) incorporates by reference the Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD).[4] Part VIII of the MUTCD is titled, "Traffic Control Systems For Rail-

---

2. Since this is the issue the court must address, cases such as *Sisk v. National R.R. Passenger Corp.,* 647 F.Supp. 861, 864 (D.Kan.1986), are somewhat distinguishable. For instance, in *Sisk* the state law in question was a local ordinance which set the speed limit for trains passing through the city. That ordinance was clearly contrary to train speed limits established by the Secretary. Thus, unlike the present case, in *Sisk* there was no question that the Secretary had issued rules which "covered the same subject matter" as the state law.

3. Since § 434 is keyed to action taken by the Secretary, the railroad's citations to highway laws, 23 U.S.C. § 101 *et seq.,* are not helpful. Although such citations may show the Secretary

had the power to take the action he did, the Secretary's *power* is not at issue in this suit. Only action actually taken by the Secretary is relevant to the matter now before the court.

4. The MUTCD was adopted by the Secretary in 1983. It is not separately set forth in the Code of Federal Regulations but is published by U.S. Department of Transportation, Federal Highway Administration. The MUTCD may be purchased from the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402 (Stock No. 050–001–81001–8). It is available for inspection and copying as prescribed in 49 C.F.R. Part 7, App.D. 23 C.F.R. § 655.601(a) (1990).

road—Highway Grade Crossings." A relevant portion of Part VIII states as follows:

8A–1   Functions

. . . .

With due regard for safety and for the integrity of operations by highway and railroad users, the highway agency and the railroad company are entitled to jointly occupy the right-of-way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority. Subject to such determination and selection, the design, installation and operation shall be in accordance with the national standards contained herein.

8A–2   Use of Standard Devices

The grade crossing traffic control devices, systems, and practices described herein are intended for use both in new installations and at locations where general replacement of present apparatus is made, consistent with Federal and State laws and regulations.

. . . .

8D–1   Selection of Systems and Devices

The selection of traffic control devices at a grade crossing is determined by public agencies having jurisdictional responsibility at specific locations . . .

. . . .

Due to the large number of significant variables which must be considered there is no single standard system of active traffic control devices universally applicable for grade crossings. Based on an engineering and traffic investigation, a determination is made whether any active traffic control system is required at a crossing and, if so, what type is appropriate. Before a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State.

MUTCD, pp. 8A–1 and 8D–1.

The railroad also points out that the MUTCD is adopted as the "national standard for all traffic control devices installed on any street, [or] highway . . . open to public travel," 23 C.F.R. § 655.603(a) (1990), and is the standard for rail-highway grade crossing improvements pursuant to 23 C.F.R. § 646.214(b) (1990). Furthermore, 23 C.F.R. § 655.603(d) states that:

Each State . . . shall have a program as required by Highway Safety Program Standard Number 13, Traffic Engineering Services (23 CFR 1204.4) which shall include provisions for the systematic upgrading of substandard traffic control devices and for the installation of needed devices to achieve conformity with the MUTCD.

Highway Safety Program Guideline No. 13, Traffic Engineering Services, ¶¶ (I)(D)(5), 23 C.F.R. § 1204.4, states in part that a state's program should have "[a]n implementation schedule to utilize traffic engineering manpower to . . . [a]nalyze potentially hazardous locations, such as sharp curves, steep grades, and railroad grade crossings and develop appropriate countermeasures."

The railroad also points out that 23 C.F.R. Part 646 A (with respect to federal aid highways), and Part 924 (dealing with all other public roads) contain regulations by the Secretary dealing with the upgrading of rail-highway crossings. For instance, 23 C.F.R. § 924.1 says its purpose "is to set forth policy for the development and implementation of a comprehensive highway safety improvement program in each State." The planning component of this program notes that the states are to have a process which will establish "priorities for implementing highway safety improvement projects." 23 C.F.R. § 924.9(a)(4). In addition, to establish such priorities the program is to consider, among other things, "[t]he relative hazard of public railroad-highway grade crossings based on a hazard index formula." 23 C.F.R. § 924.9(a)(4)(iii).

The railroad argues that the above regulations indicate the Secretary has promulgated rules dealing with the duty to install active warning devices at railroad crossings. More specifically, the railroad argues that since the MUTCD states that

"[t]he determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority," the state—not the railroad—has the duty to install active warning devices at dangerous railroad crossings.

There are a few cases which have directly addressed the issue of the FRSA's preemptive effect on a railroad's common law duty to use reasonable care when passing through highway crossings. Those cases sharply differ, however, on the applicability and extent of preemption by the FRSA on such a claim.

The pertinent cases can be divided into the following three categories: (1) strict preemption, *Armijo v. The Atchinson, Topeka and Santa Fe Railway, Co.*, 754 F.Supp. 1526 (D.N.Mex.1990); (2) no preemption, *Karl v. Burlington Northern R. Co.*, 880 F.2d 68 (8th Cir.1989); and (3) contingent preemption, *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149, 1154 (9th Cir.1983).[5]

The railroad's primary argument in this case relies on the strict preemption principles used by the very recent New Mexico case of *Armijo*.[6] The New Mexico court found that the Secretary acted with regard to the installation of warning devices at railroad crossings by the promulgation of the procedures outlined in 23 C.F.R. § 646.200 *et seq.* and by the adoption of the MUTCD as the national standard. *Armijo*, at 1531. More specifically, the court noted that the MUTCD, Part VIII, ¶ 8A–1, states that "the determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority." *Armijo*, at 1531. As a result, the court concluded that any New Mexico state common law or statutory law placing a duty on the railroad to determine the need and selection of the appropriate warning devices at a railroad crossing was

preempted by the FRSA because the Secretary had adopted rules covering that subject matter within the meaning of § 434. *Id.* at 1530.

The *Armijo* opinion is well reasoned and sets forth a persuasive argument for adoption of the strict preemption standard. However, the result of using that standard is terribly inequitable and contrary to the recognized view that "§ 434 manifests an intent to avoid gaps in safety regulations by allowing state regulation until federal standards are adopted." *Southern Pacific Transp. v. Public Utilities Com'n*, 647 F.Supp. 1220, 1225 (N.D.Cal.1986), *aff'd per curiam*, 820 F.2d 1111 (9th Cir.1987).

For instance, if the strict preemption view is adopted, then preemption of the railroad's common law duty occurred either in 1983, when the MUTCD was first adopted by reference by the promulgation of 23 C.F.R. § 655.601(a), or in 1975, when the Secretary first promulgated 23 C.F.R. § 646.200 *et seq.* However, the relevant state or local authorities would not yet have had a duty to replace or upgrade the warning device at an unreasonably dangerous crossing on either of those effective dates.

Part VIII of the MUTCD, ¶ 8A–2, specifically notes that its standards are only "intended for use both in new installations and at locations where general replacement of present apparatus is made." Thus, by its own terms the MUTCD would not apply to a crossing until a formal decision was made to install either a new or a different warning device. In addition, 23 C.F.R. § 646.200 *et seq.* (specifically §§ 646.216(d), 646.218, and 646.220) require an agreement to be entered into between the railroad and the state before federally reimbursable improvements at a grade crossing may be made. Plus, §§ 646.216(d) and 646.218 require FHWA approval before federally re-

---

**5.** In finding no preemption on the facts before the court, Judge Saffels, in *Taylor v. St. Louis Southwestern Ry. Co.*, 746 F.Supp. 50, 54–55 (D.Kan.1990), relied in part on *Karl* and in part on *Marshall,* but did not state which rationale the court was following. In another very recent case, *Easterwood v. CSX Transportation, Inc.*, 742 F.Supp. 676 (N.D.Ga.1990), the court basi-

cally followed the *Marshall* rationale but concluded preemption applied.

**6.** It should be noted that the court in *Armijo*, 754 F.Supp. at 1531–32, alternatively relies on the hereinafter-to-be-addressed contingent preemption rationale used by the Ninth Circuit in *Marshall.*

imbursable improvements may be made at the crossing in question.

Therefore, contrary to the mandate in *Southern Pacific*, there would be a gap in the duty to protect against unreasonably dangerous crossings between the time the referenced regulations were promulgated by the Secretary and a formally enforceable decision was made by the state as to the proper device to be used at a particular crossing. Such a rule, instead of promoting railroad safety at crossings, as the FRSA was intended to do, would actually foster retarded improvement of warning devices at such crossings. That is, the railroad would have little or no incentive to make necessary improvements at crossings which were known to be unreasonably dangerous. Moreover, the railroad would likely be much less eager to notify relevant state authorities of crossings known to be unreasonably dangerous and to enter into required agreements with the state for improvements of such crossings. Thus, the probability that the decision to upgrade an unreasonably dangerous crossing would get lost in a bureaucratic shuffle would be much greater.

Furthermore, no regulation promulgated by the Secretary has been brought to the attention of the court which would *prohibit* a railroad from voluntarily deciding to put in place an improved warning device at a crossing during the gap period. That is, as already indicated, ¶ 8A–2 of the MUTCD specifically notes that the standards therein set forth are only intended to apply when the state actually makes a decision to improve a crossing. Moreover, the provisions in 23 C.F.R. § 646.200 *et seq.* only apply to a crossing after an agreement is entered into between the railroad and the state (and in some instances only after FHWA approves the state-railroad agreement). As a result, it appears a railroad still has the authority to decide to install an improved signal device at an unreasonably dangerous crossing during the gap period.

Because of the above reasons, the court declines to follow the strict preemptive view. Next, the court will address the no preemption theory used by *Karl v. Bur-lington Northern R. Co.*, 880 F.2d 68 (8th Cir.1989).

The court in *Karl* did not address the referenced explicit preemption language in 45 U.S.C. § 434 or the legislative history which clearly indicates a congressional intent for nationally uniform standards of railroad safety. Moreover, in setting forth general preemption standards, the *Karl* court said that, "state laws may be preempted if they actually conflict with an express or implied federal declaration, or if the state law is in a field that is so pervasively controlled by federal law that no room is left for state rulemaking." *Karl*, 880 F.2d at 76. Thus, *Karl* did not recognize the first example of preemption used by the Supreme Court in *English*, —— U.S. at ——, 110 S.Ct. at 2275, 110 L.Ed.2d at 74 (where Congress explicitly defines the extent to which it preempts state law, *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. at 95–98, 103 S.Ct. at 2898–2901). Since this court has already found that type of preemption applies to this case, the reasoning used in *Karl* is not persuasive.

The only other circuit court to directly address the issue of whether the FRSA preempts the common law duty of a railroad to provide adequate warning at railroad crossings is *Marshall v. Burlington Northern, Inc.* There, in finding no preemption on the facts before the court, now-Justice Kennedy said:

The [MUTCD] prescribes that the selection of devices at grade crossings and the approval for federal funds is to be made by local agencies with jurisdiction over the crossing. Thus, the Secretary has delegated federal authority to regulate grade crossings to local agencies.

*The locality in charge of the crossing in question has made no determination under the manual regarding the type of warning device to be installed at the crossing. Until a federal decision is reached through the local agency on the adequacy of the warning devices at the crossing, the railroad's duty under applicable state law to maintain a "good and safe" crossing is not preempted.*

720 F.2d at 1154 (emphasis added; citation omitted).

This court refers to the rule used in *Marshall* as contingent preemption because, as is evident from the above quote, it recognizes the preemptive effect of 45 U.S.C. § 434 but holds the extent of that preemption is limited, and, in that case, has not yet occurred. More specifically, Justice Kennedy found that under the regulatory scheme of the Secretary, preemption of a state-imposed duty on the railroad to provide adequate warnings at railroad crossings was not preempted until the responsible state agency made a determination regarding the type of warning device to be installed. This rule makes the most sense, given the present regulatory scheme and other practical considerations.

For instance, as has already been noted, ¶ 8A–2 of the MUTCD indicates that the MUTCD does not apply to a crossing until a formal decision is made to install either a new or different warning device at the crossing. In addition, no regulations have been brought to the attention of the court which would prohibit a railroad, during the "gap" period, from voluntarily implementing improved safety devices at railroad crossings known to be unreasonably dangerous.

Moreover, this rule furthers the FRSA policy of promoting railroad crossing safety. That is, since the railroad is still responsible for unreasonably dangerous crossings during the gap period, the railroad itself is encouraged to improve the warning device in use at such a crossing. This rule also strongly encourages the railroad to cooperate with state and federal authorities to obtain regulatory approval of improvements to warning devices in use at a crossing. *See McMinn v. Consolidated Rail Corp.*, 716 F.Supp. 125, 127 n. 5 (S.D.N.Y.1989) (recognizes part of the railroad's duty in guarding against unreasonably dangerous crossings entails seeking regulatory approval for the necessary improvements, and if the railroad is not vigorous in its attempts to gain the proper authorizations, then it is inappropriate to absolve the railroad of liability). *See also* Kan.Admin. Regs. 82–7–4(a) (specifically notes that the railroad can request the Kansas Corporation Commission to inspect any railroad crossing and the Commission then has to make a designation of whether or not the crossing is dangerous).

However, the railroad argues that even if the court follows the *Marshall* rationale in this case, the latest date of preemption would be when KDOT placed the crossing in question on the improvement list in 1985. The railroad reasons that the only prerequisite for preemption is for the state to give some indication as to the "adequacy" of the warning device at a particular crossing. It bases this rationale on the fact that the court in *Marshall* said that "[u]ntil a federal decision is reached through the local agency on the adequacy of the warning devices at the crossing, the railroads's duty under applicable state law to maintain a 'good and safe' crossing ... is not preempted." 720 F.2d at 1154 (citation omitted). This argument is flawed for several reasons.

For instance, such argument ignores the "gap" period problems and ignores the fact that the MUTCD, at ¶ 8A–2, seems to indicate that the MUTCD does not apply to a crossing until a formal decision is made to install either a new or different warning device at the crossing. More importantly, however, the railroad's reasoning ignores the sentence immediately before the relied on language.

That sentence states that the relevant state authority had "made no *determination* under the manual regarding the *type of warning device to be installed* at the crossing." *Marshall*, 720 F.2d at 1154 (emphasis added). This sentence clearly seems to modify the court's conclusion in the next sentence that no "federal decision [had been] reached through the local agency on the adequacy of the warning devices at the crossing." *Id.* As a result, the court finds that the rationale in *Marshall* mandates a finding that preemption does not occur until a "determination under the [MUTCD] regarding the type of warning device to be installed at the crossing" is made. *Id.*

A good argument can be made that no "determination" is made by the relevant state agency concerning the "type of warning device to be installed" until a formal enforceable agreement is entered into for the installation of such warning device. For instance, 23 C.F.R. §§ 646.216(e), 646.-218, and 646.220 all require a formal agreement to be entered into between the railroad and the relevant state agency before federal funds are available for the improvement of a railroad crossing warning device. In addition, projects seeking federal funding under either § 646.216 or § 646.218 require FHWA approval before the state-railroad agreement is an enforceable agreement. Thus, in those cases where FHWA approval of the state-railroad agreement is required (i.e., § 646.216(e) or § 646.218 applied), preemption would not occur until such approval was forthcoming. In those case where FHWA approval is not necessary (i.e., § 646.220 applies), preemption would occur as soon as a formal state-railroad agreement was entered into.

It should also be noted that subparagraph (d)(1)(ii) of § 646.220 requires compliance with 23 C.F.R. § 140, Subpart I. Section 140.916, which is within Subpart I, states that:

> The cost of essential protective services which, in the opinion of a railroad company, are required to ensure safety to railroad operations during certain periods of the construction of a project, is reimbursable provided an item for such services is incorporated in the State-railroad agreement or in a work order issued by the State and approved by FHWA.

This provision is important for two reasons. First, it recognizes that the Secretary intended the railroad to be responsible for some aspects of railroad safety even during construction (i.e., after a formal agreement was entered into). Second, it recognizes that the entering into of the state-railroad agreement is a time for switching of duties.

Thus, since many duties and obligation are either incurred or switched by the en-

tering into of an enforceable state-railroad agreement, it would be reasonable to assume that preemption also occurs at such time. However, given the established facts in this case, it is not necessary for the court to determine in this case whether preemption does not occur until the entering into of the agreement.

The *Marshall* rule mandates that preemption does not occur until a "determination" is made as to the "type of warning device to be installed." An established fact in this case is that KDOT did not approve the project to install signals at the crossing in question until December 28, 1987. If the *Marshall* rule is applied to such established fact, the court must conclude the *earliest* time preemption could have occurred was on December 28, 1987.[7] Since the accident in question occurred on September 29, 1987, the court finds that preemption of the railroad's common law duty to provide an active or additional warning device at a crossing believed to be unreasonably dangerous had not yet occurred.

■ An alternative argument made by the railroad is that Kansas has, by statutes and regulations, changed the common law duty of the railroad. For instance, the railroad notes that Kansas has said by statute that the Kansas Secretary of Transportation, the State Corporation Commission, or in some instances local authorities, may designate railroad crossings which are dangerous and need installation of different safety devices. K.S.A. §§ 8–1552, 8–2005, 66–231a, and 68–414. Plus, the MUTCD has been specifically adopted in Kansas and is to be used by the authorities in making upgrade determinations. K.S.A. §§ 8–2003, 66–231a, and Kan.Admin.Regs. 82–7–4(c) (1989). This argument is not persuasive.

The cited sections merely recognize that the state has the *authority* to require the railroad to install a different warning device if the state determines the crossing to be dangerous. No state law is brought to the attention of the court which requires state authorities, and only state authorities,

---

**7.** Thus, the later date of when an enforceable state-railroad agreement was actually entered

into is irrelevant given the established facts in this case.

to make the determination that a crossing is unreasonably dangerous. Furthermore, K.S.A. 66–231a states that:

The provisions of this section shall be deemed to provide an additional and alternative method of providing for safety at railroad grade crossings and shall be regarded as supplemental and additional to powers conferred by other state laws.

Notwithstanding the foregoing provisions of this section, nothing herein shall be construed as affecting the civil liability of any entity for the maintenance or designation of any railroad crossing.

This section seems to clearly indicate that the legislature did not intend to change the railroad's common law duty. Finally, as the court has recognized, the standards in the MUTCD do not apply until a formal decision to install a new or different warning device is made.

Therefore, as more fully set forth above, the court finds the common law rule, that where unusually dangerous conditions exist at a railroad crossing "additional warnings and precautions by the railroad company may be necessary," is unaffected by the arguments of the railroad in the present case. *Sexsmith*, 209 Kan. at 108, 495 P.2d 930.

IT IS THEREFORE ORDERED this 7th day of February, 1991, that Burlington Northern Railroad Company's motion for partial summary judgment (Dkt. No. 62) is denied.